J. Brett Busby, Justice
Appellees Richard Cuevas, Daniel Cuevas, Guadalupe Torres, Luis de los Santos, and Blake Smith, and decedent Nicolas Oscar Cuevas (Nico), were employees of J. V. Industrial Companies, Ltd. (JVIC) working as boilermakers during a turnaround at the Memphis, Tennessee refinery owned and operated by Valero Energy Corporation and Valero Refining Company-Tennessee, L.L.C. (collectively *536 Valero). Daniel, Nico, and Richard are brothers. Daniel, Nico, and Torres were working on an elevated platform to install a blind in a flare line from which flammable substances had not been cleaned. An explosion occurred and all three were severely burned; Nico died from his burns four days later. Richard, Santos, and Smith, all working on the ground near the platform, were injured by the explosion.
Appellees, which include the Cuevas brothers' parents and Smith's and Torres's spouses, sued numerous defendants. One of the defendants is appellant Critical Path Resources, Inc., which was hired to schedule work during the turnaround. All defendants except Critical Path settled prior to trial. Following a lengthy trial, the jury found in favor of appellees. The jury found that Critical Path was six percent responsible for the explosion and resulting injuries. The trial court subsequently signed a judgment based on the jury's verdict awarding appellees "the total sum of $8,466,656.07 in damages, including prejudgment interest, over and against [Critical Path] for negligence."
Critical Path raises four issues in this appeal. In its first and second issues, Critical Path argues that the evidence is legally and factually insufficient to support the jury's finding that Critical Path (1) breached its duty of care, and (2) that Critical Path's acts or omissions proximately caused the injuries suffered by appellees. Because there is legally and factually sufficient evidence that Critical Path breached its duty to schedule the isolation and cleaning of the flare line and that the breach was a proximate cause of appellees' injuries, we overrule Critical Path's first two issues.
In its third issue, Critical Path contends that the trial court abused its discretion when it refused to submit a new and independent cause instruction in the jury charge. Because (1) Critical Path's acts and omissions had not run their course and been completed so that they did not actively contribute to the explosion and injuries, and (2) the allegedly intervening acts and omissions risked the same harm and were the very hazard that made Critical Path's scheduling failure negligent, we conclude the trial court did not abuse its discretion when it rejected Critical Path's requested instruction.
In its fourth issue, Critical Path challenges the sufficiency of the evidence supporting some of the economic and non-economic damages found by the jury. We conclude that most of the jury's damage awards are supported by sufficient evidence, and we therefore affirm the judgment on the claims of most appellees. Because the evidence is factually insufficient to support the total amount of future medical damages awarded to Daniel, and the total amount of non-pecuniary damages awarded to Mr. and Mrs. Cuevas, we suggest a remittitur to an amount supported by the evidence. If a remittitur of the unsupported damages is timely filed, we will modify the trial court's judgment in part and affirm as modified. If it is not, we will reverse the judgment as to the claims of Daniel and Mr. and Mrs. Cuevas and remand those claims for a new trial.
BACKGROUND
A. Mike Rivers of Critical Path serves as master scheduler for a turnaround of Valero's Memphis refinery.
Valero owns and operates a refinery in Memphis, Tennessee. Refineries periodically schedule turnarounds: a period of time when the refinery owner shuts down part or all of the refinery to make repairs, perform maintenance and upgrades, or construct new units. Valero scheduled a turnaround for half of the Memphis refinery during February and March 2012. Valero *537 planned for the turnaround to last 32 days at a total cost of more than $60 million. Approximately half of the projected cost was for materials and labor to be used during the turnaround. The remainder of the cost consisted of profits that would be lost as a result of shutting down half of the refinery for the duration of the turnaround. Because Valero loses nearly one million dollars in profit each day of the turnaround, there is a tremendous emphasis on getting the work done as quickly and efficiently as possible.
A refinery turnaround can be divided into five phases: (1) planning, (2) shutdown, (3) actual turnaround work, (4) start-up, and (5) post-turnaround. In 2010, Valero assembled a team to plan and manage the turnaround. Valero designated Ray Hankins, a Valero employee, as the turnaround manager. Hankins was in charge of Valero employees assigned duties related to the turnaround and of contractors hired to do much of the planning and work involved.
Valero hired Dennis Hodges of UP Professional Solutions as the lead planner for the turnaround. Hodges, who reported directly to Hankins, had numerous duties. During the planning phase of the turnaround, Hodges was responsible for tracking the progress of the different planners planning the jobs to be done during the turnaround, ensuring that they were meeting the planning milestones set by Valero management. Hodges's role shifted once turnaround work started; he then tracked the progress of the work, ensuring that it was progressing according to the specifications and the turnaround plan. Hodges's duties included reminding people involved in the turnaround of the milestones set by Valero management.
Valero hired Mike Rivers of Critical Path as the master scheduler[1] for the project early in 2011. Valero paid Critical Path $97.95 per hour for a master scheduler as well as a $90 per diem. Rivers also reported directly to Hankins. Although Rivers testified that he was nothing more than a data entry clerk who passively waited for information to be handed to him and then entered it into a computer program, other evidence-including other parts of his own testimony-showed that he had additional duties.
Rivers was responsible for maintaining the master schedule for the entire turnaround through a computer program, Primavera Project Planner.[2] Valero's practice when planning a turnaround was to place every detail of any work to be done on the Primavera schedule. Rivers worked with the schedulers for the contractors involved in the turnaround and was responsible for adding their schedules to the master schedule. Rivers's responsibilities did not stop there, however. The turnaround manager, lead planner, and master scheduler worked together as a team to plan and schedule the turnaround. They met frequently to discuss the planning, the work, its progress, and any problems they encountered. Rivers, as the master scheduler, had to possess an understanding of the planner's job so that he could interact effectively and efficiently with the other members of the planning team.
During trial, Rivers agreed that it was his job as the turnaround master scheduler to "identify the tasks, figure out if there were any predecessor tasks, ask for plans, *538 and put them in the schedule and then keep the schedule." To perform his duties as master scheduler, Rivers needed to understand the jobs being done during the turnaround, the tasks associated with each of those jobs, the policies and procedures involved in the jobs, the duration of the tasks, and the resources required to perform them. He also needed to understand the job logic associated with the jobs planned for the turnaround so that he could figure out if there were predecessor tasks required. Rivers would then ask for the plans for any predecessor tasks and add them to the master schedule in the proper order and with adequate time for them to be performed. If Rivers did not get the information he needed, he was supposed to raise the issue with management. According to Rivers, there were regular discussions about job logic to make certain the tasks were scheduled in the proper order.[3] Rivers testified that these discussions would continue until the team reached a conclusion on the topic, and he would ask questions if he did not understand. Rivers also testified that if predecessor tasks are not scheduled, it can throw the turnaround off schedule. According to Rivers, getting the job logic right before importing items into the Primavera program is crucial to completing a turnaround on time, which demonstrates the importance of job planning and scheduling.
Rivers summarized his job during the planning stage of the turnaround as receiving and importing job plans into the Primavera system, "working on the logic, working with the planners to make sure that the logic is correct, [and] attending various meetings." The meetings included weekly planning meetings with turnaround management. During at least two of these meetings, Rivers was instructed to obtain assistance from Valero writer/trainer personnel regarding scheduling. According to Rivers, the writer/trainers were Valero operations personnel with knowledge of Valero's procedures. Rivers testified that he did not recall seeking out that assistance. More specifically, despite his awareness that he needed to know Valero's policies and procedures to schedule work accurately, Rivers did not recall reviewing any Valero procedures regarding isolation of vessels, purging and cleaning vessels, or vessel entry.
B. Isolation and cleaning of the south flare line is not scheduled.
Hodges explained that the first task in the turnaround planning was to develop a master work list of all work to be done. Valero management completed the master work list in June 2011. The master work list included a schedule of planning milestones for the turnaround. Among other items, the schedule called for all "Energy Isolation and Decontamination Plans" to be completed between August and November 2011.
Among the jobs included in the master work list was work on the refinery's south flare line.[4] Several different jobs were planned on the south flare line, including installing additional gate valves, line tie-ins, and sample ports. Valero also planned to replace the flare tip. Rivers knew in June 2011 that he needed to place the isolation and decontamination plans for the south flare line work on the master schedule *539 no later than the end of November 2011. Despite that knowledge, the isolation and decontamination plans for the south flare line were not included in the master schedule.[5]
On February 22, 2012, Hodges emailed Rivers and others the schedule for some of the work to be done on the south flare line. The emailed schedule had been drawn up by the contractor that would perform the work. In his email, Hodges instructed that this schedule be incorporated into the master schedule. He also reminded the recipients to include in the schedule time to "blind and un-blind the flare." Part of the job logic for installing blinds on a refinery line requires that (1) the line be isolated from the rest of the system, and (2) all flammable substances in the line be removed or neutralized. Only after these essential predecessor tasks have been completed is it safe to open up the line to install a blind, which prevents flow through the line. Rivers admitted he "knew that isolation and cleaning was absolutely necessary before entry into" the line. The master schedule, however, did not include these essential predecessor tasks.[6] Instead, the only work on the schedule was one day for installing blinds and then, immediately afterward, several days for the actual work on the line.
C. The turnaround begins and a belated plan to prepare the south flare line for work is not followed.
Ronnie Rainer worked as a writer/trainer for Valero. His normal responsibilities included working on daily operating procedures and operating manuals. Rainer was also involved in training operators. Rainer was assigned to provide operations support for the south flare line work. Rainer had no prior experience with the type of work planned on the south flare line. He also received no training on how to make sure the work was completed. Rainer was aware Valero had policies covering (1) the draining, venting, and purging of tanks, vessels, and piping; (2) work on flare lines; and (3) vessel and line opening procedures. Rainer did not, however, review those policies before the work started on the south flare line.
In mid-February, Jeff Byrnes, the general foreman for JVIC, took Rainer out to the south flare line and pointed out the work that was planned there. JVIC was one of the many contractors performing work during the turnaround and the employer of many of appellees. Byrnes described the work that was going to be done and the sections of the line where it was going to happen. Byrnes also explained the general procedure that was to be used for the work. According to Byrnes, the line would be shut down and it would need to be cleaned or decontaminated before the work could begin. Byrnes explained that *540 they would use steam to clean the line from the knockout drum all the way to the flare tip, a distance of more than 120 yards.[7]
Rainer knew the actual work on the south flare line was set to begin on March 8, a Thursday. The weekend before the work was scheduled to begin, Rainer knew there were preliminary steps that had to be taken before the work could start. Rainer had not seen a written plan for that preliminary work. Wanting the work to start on time so that contractors were not standing around doing nothing, Rainer took it upon himself to develop a plan to get the south flare line ready for the contractors. Rainer talked to Stephen Buggs, a Valero shift supervisor who had previously worked on the south flare line, about the south flare line project. According to Rainer, Buggs told him the unwritten cleaning plan Byrnes had mentioned back in mid-February would not work because it was not environmentally compliant or safe. Rainer claimed Buggs told him that the flare pilots had to remain lit during the cleaning because if they were extinguished, hydrocarbons would be steamed directly into the atmosphere.
Rainer developed a written plan that he hoped would get the south flare line isolated and cleaned before March 8. The plan relied on steaming the line to clean it of hydrocarbons. Even though his plan relied on steaming the line commencing on March 5, Rainer prefaced his plan with the statement that "I'm not sure how much steaming it will take to clear the 36" flare line and have it ready for hot work." According to Rainer's plan, once the line was cleaned and isolated, contract workers would insert three blinds into the 36-inch line. The first blind would be inserted upstream from the knockout drum. Rainer's supervisor, Timothy Crutcher, approved the plan on March 4. Later that same morning, Rainer emailed the plan to numerous people, including Hodges and Rivers. Within minutes, Hodges emailed Rainer back "we need to meet and agree on who is doing what and when. We need to have both Wyatt and [JVIC[8] ] in room together and review this. Are you available today? We need to get going on this as soon as possible."
The meeting occurred the next day. Hodges was angry during the meeting because he realized that the preliminary work for the south flare line had not been done and the work could not go forward until it was completed. Hodges had contractors showing up on March 8 and he wanted them to work. He told Rainer to get the project going and "the sooner the better." Hodges left the meeting thinking they were ready to start steaming the south flare line and that he had obtained "traction" on the job and his "wheels were no longer spinning."
That same day, Rainer and others went to close the single gate valve on the 36-inch south flare line. They were able to close the valve but unable to verify that it was not leaking hydrocarbons downstream into the section of the line they were trying to isolate. Rainer's March 4 plan was based on the presupposition that the gate valve could be closed and would completely isolate the line once it was closed. Rainer *541 testified that his supervisor, Crutcher, changed the plan in the field and instructed Rainer to insert the first blind downstream from the knockout drum rather than upstream as originally planned; workers would then steam the line from the inserted blind downstream to the flare. The new plan, calling for the opening of the south flare line before it was isolated and cleaned, was not communicated to the turnaround planning team.
As part of his preparation for the work on the south flare line, Rainer opened a valve to verify the system was de-pressurized and to ventilate the line.[9] Because the line had not been completely isolated and cleaned, it still contained hydrocarbons. The line also may have contained pyrophorics, substances frequently found in refineries that can spontaneously ignite if they contact oxygen. Rainer testified that at the time the work on the south flare line started, he was aware that the line had not been completely isolated and cleaned and that the flare pilot lights were lit. Rainer proceeded with the work on the south flare line anyway.
D. Work on the south flare line begins, an explosion occurs, and several workers are severely burned.
On March 6, Richard Cuevas's crew from JVIC was assigned the task of installing the blind in the south flare line downstream of the knockout drum. Richard found out about the blind installation job the same day it had to be completed. Richard was told that the blind job was important because it was holding up other jobs and the work was already behind schedule. Richard was also told that the job had to be completed that shift because the work on the south flare line was going to start during the next shift. Richard's crew included his brothers Daniel and Nico, as well as Guadalupe Torres, Blake Smith, and Luis de los Santos. Richard's crew were boilermakers[10] who worked turnarounds at refineries throughout the country. As boilermakers, they did not handle steaming or cleaning lines.
Rainer ran the safety meeting before the work commenced. Rainer told Richard's crew that the line was clean and the flare tip pilots were off. The required personal safety protections were also discussed during the safety meeting. Rainer told the crew that personal breathing air masks would be used. Richard asked whether the crew would need to wear fireproof bunker gear[11] during the job. Rainer said it was not needed. Rainer mentioned several times during the safety meeting that they were good to go on the job. Smith understood this to mean that the line was clean and ready to be worked on. Therefore, as the crew prepared to start working on the south flare line, they believed that the line had been isolated, they believed the line had been cleaned, and they believed that the flare pilot lights had been turned off. None of those essential predecessor tasks had happened.
Daniel, Nico, and Torres were the crew members assigned to insert the blind into the south flare line. The work site was on a raised platform about twenty feet high. The remainder of the crew were working on the ground. The three-man crew started working on opening the flange where the blind would be inserted into the line.
*542 Daniel and Torres were kneeling down at the flange removing bolts. Nico was standing by holding a large metal-banded gasket that would go on the flange to seal the line once the blind was inserted.
Daniel and Torres had removed the bolts and opened the flange about six inches when Torres felt a lot of pressure coming out of the opening, followed quickly by an explosion. The explosion blew Torres back about five feet. Torres wanted to run but he felt like he "was inside a balloon of fire" with flames all around him. Torres eventually saw an opening in the fire and got up, but was knocked back down again. Torres saw that his legs were on fire and he tried to put the flames out with his hands, but his gloves started melting into his hands, so he took them off. Torres then saw that someone was pumping water onto the platform. The water was not reaching him so he ran toward it. He passed Nico, who was lying on the platform tangled in the metal gasket he had been holding, burning. Torres reached the water, and he remembers the sound of the water hitting his burning body, and screaming, and pain.
De los Santos heard the explosion and saw flame coming out of the line break. He then saw a burning object falling off the platform. The burning object was Daniel, who had been blown off the platform by the explosion. Richard ran up to his brother and tried to put out the flames, but something stuck on his hands and they ignited. De los Santos found some cardboard on the ground, placed it on top of Daniel and rolled with him until "you could just see smoke." De los Santos saw that Daniel was blistering and that his flame retardant clothes had burnt to his skin.
De los Santos ran up on to the platform where he heard screaming and saw Torres "burnt, up there standing." De los Santos then went to Nico, who was laying on the platform still conscious. The water had not reached Nico and the fire had instead burned itself out. De los Santos removed Nico's fresh air mask, which had stuck to Nico's face. He then tried, unsuccessfully, to get Nico out of the tangled gasket. Nico told de los Santos that he could not move and then asked about his brother Daniel.[12]
Daniel, Nico, and Torres were taken to the Memphis Medical Center Burn Unit after the explosion. They were treated by Dr. William Hickerson, a plastic surgeon specializing in the treatment of burn injuries. Nico was still conscious when he arrived at the hospital even though he was burned over ninety percent of his body. His parents, Maria and Nicolas Cuevas, arrived in time to be with Nico in the burn unit. Because Nico's condition was deteriorating, the doctors asked his parents for permission to place him on comfort measures. They explained to Nico's mother "that it was actually better if he were to die because people that actually survive those kinds of burns would ask to die because it was so, so painful." Mrs. Cuevas did not want Nico to endure that type of pain and suffering when there "was no *543 chance for him to survive," so she gave permission for the doctors to use comfort measures only. Nico died four days after the explosion.
Daniel suffered third-degree burns over sixty-five percent of his body. Daniel had little chance of surviving his injuries, but he did. Daniel spent eight months in the Memphis hospital's burn unit. His parents were there with him the entire time. Daniel was next transferred to Houston, where he spent two months at the Texas Institute for Rehabilitation and Research (TIRR). Daniel then spent about four months being treated on an outpatient basis by TIRR. At the time of trial, Daniel was living at his home in the Rio Grande Valley, where his mother is his full-time primary caregiver. Daniel was not working, and evidence showed he would be unable to work into the future as a result of the severe injuries he sustained during the explosion.
Torres arrived at the burn unit with severe burns over forty-five percent of his body. Torres's chances of survival were also slim, but he survived. Torres spent three months in the Memphis burn unit. His wife, Blanca Rodriguez, was with him in the burn unit. Torres was also treated at TIRR after he was released from the burn unit. At the time of trial, Torres was living at his home in Houston and was still unable to return to work due to his injuries.
E. Valero completes the work and investigates the causes of the explosion.
Valero eventually performed the planned work on the south flare line. Before beginning the work, Valero did the essential predecessor tasks that had been missed before the explosion. Valero chemically cleaned the knockout drum and then flooded it with water. Valero next put a nitrogen purge into the line rather than a steam purge. These tasks were done in stages and took about a week to complete.
Valero also conducted an investigation into the causes of the explosion.[13] The executive summary of the investigation report states that "the incident resulted from a series of breakdowns in the implementation of safety systems leading to inadequate preparation of the flare system for maintenance work." The investigators observed that the original written plan for cleaning the south flare line was changed in the field to a plan that did not include cleaning the line before entry. The investigators determined there were several root causes of the explosion, including: (1) Valero policies related to the type of work involved were not followed; (2) the flare pilot lights remained lit; (3) the pre-work safety meetings did not adequately address the hazards involved in the work; (4) bunker gear was not used; and (5) three opportunities for air intrusion into the south flare line existed prior to and during the work-(a) the purge gas and center and tip steam systems were shut off the day before the work which allowed air to enter the line through the flare tip; (b) a drain valve was opened to verify the system was de-pressurized; and (c) the flange was opened for insertion of the blind. The investigators also determined there were contributing factors, including: (1) the Valero employee associated with the job had never performed flare isolation work before; and (2) the work on the south flare line did not have a detailed plan. The investigation placed responsibility for these root causes and contributing factors on Valero and JVIC. The leader of the investigation testified during trial that he did not consider Critical Path's responsibility for the explosion because he was not *544 aware of the company.[14]
F. The injured workers sue, a jury finds in their favor, and the trial court signs a judgment against Critical Path.
Appellees filed suit against numerous defendants, including Valero and Critical Path. All defendants except Critical Path settled prior to trial. At the end of a lengthy trial, the jury found that Critical Path, JVIC, Valero, and UP Professional[15] were negligent and that their negligence proximately caused the occurrence. The jury failed to find that any of the appellees were negligent. The jury assigned Valero responsibility for seventy percent of the harm, JVIC fourteen percent, Critical Path six percent, UP Professional six percent, and the remainder to other defendants. The jury also found the amounts of damages sustained by each of the appellees. The trial court eventually signed a judgment awarding the following damages: (1) Richard $181,724.40; (2) Daniel $4,917,085.23; (3) Nico's estate $295,301.22; (4) Mr. Cuevas $607,126.66; (5) Mrs. Cuevas $607,126.66; (6) Torres $1,526,580.27; (7) Torres's wife, Blanca Rodriguez $34,632.73; (8) de los Santos $158,854.64; (9) Smith $28,307.23; and (10) Smith's wife Tammy, $9,917.02. This appeal followed.
ANALYSIS
I. Sufficient evidence supports the jury's finding that Critical Path was negligent and that its negligence proximately caused appellees' injuries.
Critical Path argues in its first issue that the evidence is legally and factually insufficient to support the jury's determination that Critical Path breached its duty to use ordinary care in scheduling tasks during the Valero turnaround. In its second issue, Critical Path asserts the evidence is legally and factually insufficient to support the jury's finding that its negligence proximately caused the injuries.
A. Standard of review and applicable law
When an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that there is no evidence to support the adverse finding. Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC , 403 S.W.3d 547, 550 (Tex. App.-Houston [14th Dist.] 2013, no pet.). In conducting a legal-sufficiency review, we must consider all the record evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports it. Id. at 550-51 (citing City of Keller v. Wilson , 168 S.W.3d 802, 821-22 (Tex. 2005) ). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. Id. at 551. This Court must credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not. Id. The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. Id.
We sustain a legal sufficiency (or no-evidence) issue only if the record reveals one of the following: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence *545 offered to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. Id. Evidence that is so weak as to do no more than create a mere surmise or suspicion that the fact exists is less than a scintilla. Id.
In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering the evidence both in favor of, and contrary to, the challenged findings. See Maritime Overseas Corp. v. Ellis , 971 S.W.2d 402, 406-07 (Tex. 1998) ; Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986). When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Ellis , 971 S.W.2d at 407 ; Nip v. Checkpoint Sys., Inc. , 154 S.W.3d 767, 769 (Tex. App.-Houston [14th Dist.] 2004, no pet.). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. GTE Mobilnet of S. Tex. v. Pascouet , 61 S.W.3d 599, 616 (Tex. App.-Houston [14th Dist.] 2001, pet. denied). This Court is not a factfinder. Ellis , 971 S.W.2d at 407. Instead, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. GTE Mobilnet , 61 S.W.3d at 615-16. Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence also would support a different result. Id. When presented with conflicting evidence, a jury may believe one witness and disbelieve others, and it also may resolve any inconsistencies in the testimony of any witness. McGalliard v. Kuhlmann , 722 S.W.2d 694, 697 (Tex. 1986). If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. Gonzalez v. McAllen Med. Ctr., Inc., 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).
To prevail on a negligence claim, a plaintiff must establish a duty, a breach of that duty, and damages proximately caused by the breach. Kroger Co. v. Milanes , 474 S.W.3d 321, 335 (Tex. App.-Houston [14th Dist.] 2015, no pet.). An occurrence may have more than one proximate cause. Del Lago Partners, Inc. v. Smith , 307 S.W.3d 762, 774 (Tex. 2010). Proximate cause cannot be established by mere conjecture, guess, or speculation. Doe v. Boys Clubs of Greater Dallas, Inc. , 907 S.W.2d 472, 477 (Tex. 1995). Proximate cause may, however, be established by direct or circumstantial evidence and the reasonable inferences drawn from that evidence. Ford Motor Co. v. Ridgway , 135 S.W.3d 598, 601 (Tex. 2004). Proximate cause consists of two elements: cause-in-fact and foreseeability. Del Lago Partners, Inc. , 307 S.W.3d at 774. Critical Path has not challenged the element of foreseeability in this appeal.
The test for cause-in-fact is whether the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. Western Inv., Inc. v. Urena , 162 S.W.3d 547, 551 (Tex. 2005) ; Lee Lewis Constr., Inc. v. Harrison , 70 S.W.3d 778, 784 (Tex. 2001). The plaintiff need not exclude all possibilities of how the injury occurred; it is sufficient to prove that the greater probability is that the defendant's conduct, alone or in contribution with others, was a cause of the injury. First Ass'y of God, Inc. v. Tex. Utils. Elec. Co. , 52 S.W.3d 482, 493 (Tex. App.-Dallas 2001, no pet.). A substantial factor is one that reasonable people would regard as a cause *546 in the popular sense of the word, in which there lurks the idea of responsibility. Lear Siegler, Inc. v. Perez , 819 S.W.2d 470, 472 (Tex. 1991). "[T]he conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm." IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason , 143 S.W.3d 794, 799 (Tex. 2004). Cause-in-fact is not shown if the defendant's negligent act or omission did no more than furnish a condition that made the injury possible. Urena , 162 S.W.3d at 551.
These causation principles have proven difficult to articulate coherently and apply consistently. One potential source of confusion is that although the "substantial factor" analysis is nominally part of the cause-in-fact element, it also requires a legal analysis of whether the injury is "too remotely connected with [the defendant's] conduct to constitute legal cause"[16] -an analysis that "mandates weighing of policy considerations" and that was historically conducted as part of the foreseeability element.[17] In conducting this analysis, courts frequently proceed by comparing and contrasting the facts of various cases addressing whether a defendant's negligent act or omission was a substantial factor in causing the plaintiff's injury.[18] More generally, courts consider whether the dangerous force or situation created by the defendant's negligence had abated or come to rest before the injury,[19] and whether the negligence merely "furnished a condition" by attracting the plaintiff to or placing him in a particular location at a particular time where he happened to be injured by a third party.[20]
B. Sufficient evidence supports the jury's finding that Critical Path breached its duty of ordinary care.
Critical Path argues in its first issue that there is legally and factually insufficient evidence that it breached its duty to use ordinary care in scheduling tasks during the turnaround because appellees "never offered a copy of the 'master schedule' for the days leading up to, or even the day of," the explosion. Critical Path further asserts that none of the schedule exhibits admitted into evidence are sufficient evidence of what was, or was not, in the master schedule in the days leading up to the explosion. Critical Path contends that testimonial evidence is insufficient to overcome this deficiency in the documentary evidence because (1) certain testimony of appellees' expert, Peter Howell, was "conclusory and of no legal value" because it was based on a scheduling document *547 that Rivers did not create, and (2) Critical Path had no unilateral authority to plan and schedule turnaround tasks on the master schedule.
Even apart from Howell's challenged testimony, we conclude there is sufficient evidence that Critical Path breached its duty of ordinary care. As to whether Critical Path had unilateral authority to plan and schedule, Critical Path argues that Rivers was nothing more than a data entry clerk and his authority extended only to importing plans that had been handed to him into the Primavera program. Critical Path's argument is not supported by the record. Appellees did not contend that Rivers had the unilateral authority as master scheduler to plan and schedule tasks on the master schedule. Appellees instead offered ample evidence (summarized in Part A of the background section above) that Rivers had the duty to: (1) be an active participant in the turnaround planning team; (2) become familiar with both his employer's policies as well as Valero's policies and procedures related to the jobs scheduled during the turnaround; (3) be aware of and work out the job logic of the turnaround jobs; (4) figure out whether predecessor tasks were required; (5) ask for the plans for those predecessor tasks; (6) add the plans to the master schedule in the proper order and with adequate time for them to be completed; and finally, (7) raise any questions he had regarding job logic and the master schedule with management.
In addition, there is evidence that Rivers failed to carry out these duties with respect to the work on the south flare line.[21] Critical Path does not dispute that Rivers had the duty to maintain the master schedule for the turnaround. Undisputed evidence showed that it was Valero's practice to include all tasks involved in the turnaround, even small ones, on the master schedule. Valero instructed the turnaround management team, which included Rivers as master scheduler, to schedule the isolation and decontamination tasks for the south flare line by November 2011. Rivers admitted he had not scheduled those tasks by January 2012.[22] Further, although the schedule for March 6 is not in the record, Rivers testified that he could not recall ever scheduling the isolation and decontamination tasks. Critical Path's expert, Gregg Perkin, admitted that he could not recall seeing a schedule that included time for isolation.
More specifically, there is evidence that Rivers failed to familiarize himself with Valero's policies and procedures regarding isolation and decontamination, seek plans for the predecessor tasks those policies required, and put those plans on the schedule in the proper order and with *548 adequate time for completion. According to Rivers, job logic dictates that isolation and cleaning of a line or vessel is a necessary predecessor task to entry into that line or vessel. Rivers admitted that he needed to know Valero's policies and procedures so that his schedules would be correct. Yet Rivers conceded that he never reviewed Valero's policies and procedures regarding isolation, cleaning, and entry even though he was instructed twice during planning meetings to obtain that information from Valero operations personnel.
The record also contains evidence that Rainer, the Valero operations person responsible for the south flare line work, had not seen a written plan for the isolation and decontamination work on the south flare line the weekend before the actual turnaround work was scheduled to begin. Rainer emailed the plan he developed on his own initiative to Hodges and Rivers on March 4. John Brewer, the leader of Valero's team investigating the explosion, testified that Rainer's March 4 plan was the only written plan the investigators found and that there was no evidence of a plan before that date.
Finally, there is evidence that Rivers, having received Rainer's eventual plan, again failed to schedule tasks required to isolate the line. Rivers testified it was not unusual to receive plans like Rainer's after a turnaround had started. As noted above, Rivers's obligations as master scheduler included familiarizing himself with applicable policies and procedures, figuring out whether they required predecessor tasks, requesting plans for those tasks, and including plans for all tasks on the master schedule with adequate time for completion. In the plan, Rainer informed Rivers and the other recipients that he intended to rely on a single gate valve to isolate the south flare line. As Howell explained, old single gate valves are notorious for leaking and cannot be relied upon to isolate a line being opened for work. Howell testified that the obligation of a scheduler in this circumstance was to bring the valve isolation problem to the attention of the appropriate planning and operations personnel and tell them that applicable safety procedures required a different method of isolation, which Rivers failed to do.[23] Rivers admitted that he could not recall ever scheduling any isolation work.
We conclude the jury could reasonably find from this evidence that Rivers never reviewed policies, requested plans, or scheduled the isolation and decontamination tasks for the south flare line, which was a breach of Critical Path's duty of ordinary care. See Crosstex N. Tex. Pipeline, L.P. v. Gardiner , 505 S.W.3d 580, 607 (Tex. 2016) ("To establish the breach, the plaintiff must prove that the defendant's conduct constituted negligence, which is simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done." (internal quotation marks omitted)). We overrule Critical Path's first issue.
C. Sufficient evidence supports the jury's finding that Critical Path's breach was a cause-in-fact of appellees' injuries.
Critical Path argues in its second issue that the evidence is legally and factually insufficient to support the jury's finding that its negligence was a proximate cause of appellees' injuries. More specifically, Critical Path asserts that its scheduling failure was not a cause-in-fact of the explosion because it was too attenuated *549 and remote from that harm to be a substantial factor in bringing it about. We disagree.
As discussed above, the evidence supports a finding that Critical Path negligently failed to schedule the isolation and decontamination tasks necessary to prepare the south flare line for entry. The report on Valero's investigation summarized the causes of the explosion as "a series of breakdowns in the implementation of safety systems leading to inadequate preparation of the flare system for maintenance work." Specifically, the report identified as a root cause of the explosion that safety procedures for line opening and pipe purging "were not properly followed ... in that the vessel was not cleared of flammable/combustible materials and/or pyrophorics prior to opening which provided a fuel and ignition source for the flash fire." The report also listed the lack of a "detailed plan" for the south flare line work as a contributing factor in the explosion. Although the report does not mention Critical Path by name, the jury could consider it as evidence that Critical Path's negligence was a substantial factor in causing the explosion because other record evidence showed Critical Path was responsible for reviewing Valero's safety procedures regarding isolation and decontamination, seeking plans for the predecessor tasks those policies required, and putting every detail of the work to be done on the schedule.
Critical Path points, however, to two events that occurred after its initial failure to schedule the isolation and decontamination by November 2011. The first occurred when Valero personnel changed Rainer's plan of March 4, 2012, which Critical Path contends would have safely isolated and decontaminated the south flare line, to a plan doomed to failure. The second event is the failure of personnel on the scene to heed indications that the south flare line was live and to stop work on the line once the flare stack started smoking and then emitting flame. Critical Path argues these negligent acts or omissions were the actual causes of the explosion and, as a result, its own initial failure to schedule the isolation and decontamination of the south flare line timely was too attenuated to be a substantial factor in causing the explosion and injuries. Critical Path suggests that, at worst, Rivers's scheduling failure did no more than furnish a condition for the negligence of others to occur.
We conclude neither event establishes that the evidence of cause-in-fact is legally or factually insufficient. First, the evidence at trial was disputed regarding the safety of Rainer's belated March 4 plan. Although some witnesses testified to that effect, Critical Path's own expert testified that Rainer's plan was so flawed that "the accident was going to happen sooner or later" because the planned use of a single gate valve for isolation and of steam for decontamination did not adequately address the safety hazards present in the line.[24] Based on this evidence, the jury could reasonably find that Rainer's March 4 plan for the unscheduled work would not have safely isolated and decontaminated the south flare line.[25]
*550 As Critical Path points out, Rainer's supervisor later changed the March 4 plan to insert the first blind in a different location before steaming the line. Given the testimony of Critical Path's expert that "the accident was going to happen" even without this change, a reasonable jury could find that the change was not a cause-in-fact of appellees' injuries. See Urena , 162 S.W.3d at 551 (explaining test for cause-in-fact is "whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred").
Second, a reasonable jury could find that there was not a reasonable opportunity to stop the work once the flare stack started smoking and emitting flame. Most of the witnesses who testified to seeing either smoke or flames coming out of the flare stack also testified that they were unsure what was going on because they believed the south flare line had been isolated and cleaned before the work commenced on March 6. Other witnesses, including Richard, testified that they did not see the smoke or flames prior to the explosion.
Yet even if we assume that the change in Rainer's plan or the failure to stop the work was a cause of the incident, more than one act may be a proximate cause of the same injury. Harrison , 70 S.W.3d at 784. The record certainly contains evidence of other contributing causes, including Rainer's negligent March 4 plan, the failure to heed the work permit's statement that the line contained flare gas, and the failure to require the JVIC workers to follow safety protocols such as wearing bunker gear. Indeed, the jury took these causes into account in apportioning more responsibility for the harm to Valero and JVIC than to Critical Path. See Del Lago Partners , 307 S.W.3d at 774. But on this record, a reasonable jury could also find that Critical Path's failure to schedule the isolation and cleaning of the south flare line was a substantial factor in causing the explosion and injuries. See Lopez v. Wildcat Cranes, Inc. , No. 02-14-00254-CV, 2015 WL 4606114, at *5 (Tex. App.-Fort Worth Oct. 1, 2015, pet. denied) (mem. op.) ("Because more than one cause in fact may exist for an injury, a reasonable juror could agree that these variables contributed to the incident and nevertheless still find that Wildcat Crane's negligent acts were a substantial factor in causing the scissor lift to tip and without which the harm would not have occurred.").
Critical Path contends that its failure to schedule the work by November 2011 is simply too far attenuated from the March 2012 accident. It cites Arguelles v. Kellogg Brown & Root, Inc. , 222 S.W.3d 714, 731 (Tex. App.-Houston [14th Dist.] 2007, no pet.), where we held that a defendant's failure to recommend in 1996 that a plant owner install additional monitors and alarms on a particular tank was too remote to be a substantial factor in the explosion of that tank in 2000.
Unlike in Arguelles , the negligence and injury here are much closer in time, and our record includes evidence that the dangerous situation created by Critical Path's negligence had not abated or come to rest when appellees were injured. Perkin, Critical Path's expert, explained that scheduling ensures the right things are done efficiently at the right time with the right equipment and the right people. Appellees'
*551 expert Howell agreed that one of the reasons Valero hired a master scheduler was to minimize the work time, which was extremely important given that Valero would lose nearly one million dollars per day during the turnaround. As both Critical Path's Rivers and JVIC's Byrnes explained, failing to plan and schedule required tasks can throw the turnaround off schedule, leading to even more of a sense of urgency.[26]
Having been hired for these purposes, Critical Path's Rivers failed to identify the isolation and decontamination tasks that Valero's policies required for the south flare line work, request plans for those tasks, and put that information on the master schedule by November 2011. This negligence, appellees' expert Howell explained, resulted in the following urgent situation: by the weekend of March 3 and 4, 2012, no schedule was in place to give Valero the time, people, and equipment needed to complete the required tasks safely before work was scheduled to begin on March 8.
The jury also heard evidence that Valero's Rainer, after discovering that there was no schedule for isolating and decontaminating the south flare line, hastily developed a flawed plan on March 4 to keep the turnaround moving forward. The lead planner expressed his anger that the work could not go forward until the line was clean, and both he and Rainer said they did not want contractors standing around doing nothing. When the single gate valve Rainer planned to use for isolation proved insufficient, Rainer's supervisor changed the March 4 plan to insert the first blind before decontaminating the line. The JVIC workers were carrying out this plan when the explosion occurred.[27]
None of these developments indicate that the dangerous situation created by Critical Path had abated. Critical Path's expert agreed that because the planning and scheduling work was not done in the office, that left Rainer trying to do it on the fly, which was completely insufficient. Rivers also testified that he understood how the failure to plan and schedule this job ultimately manifested itself with Rainer in the field.
In particular, Valero still had insufficient time: Howell testified that Valero would have had to start isolation and cleaning at least by March 1 to complete the necessary steps before work was scheduled to begin on March 8.[28] As to people, Rainer *552 himself admitted that he was not qualified to develop the plan, which should have been completed and thoroughly evaluated long before he got involved.[29] Regarding equipment, Howell testified that one method of isolating a line with a single gate valve safely is to perform a hot tap and insert a stopple, which takes at least a half-day to complete and would be done by a company specializing in such work, not by a crew of boilermakers like that used by Valero.[30]
Moreover, Critical Path's scheduling duties and its negligence were ongoing. As explained in Part I.B., Rivers received Valero's March 4 plan, which relied on the single gate valve to isolate the line. But he failed once again to review job logic and consult applicable policies, raise the isolation problem, and schedule the tasks required to isolate the line.
Based on this and other record evidence set out in the background section above, a reasonable jury could find that the dangerous situation created by Critical Path's negligent failure to request plans and schedule tasks to isolate and decontaminate the line was that flammable substances remained without sufficient time to plan and execute their safe removal before the job began. The failures of Rivers and others to abate this danger show that Critical Path's negligence did not "come to rest" before the explosion. See Homeland Express, L.L.C. v. Seale , 420 S.W.3d 145, 150-51 (Tex. App.-El Paso 2012, no pet.) (holding dangerous situation created by defendant parking truck partially in a highway lane had not come to rest when third party cut plaintiff off, forcing him to swerve into the lane and clip the truck). Because Critical Path had the obligation-as well as the necessary knowledge and access to information-to arrange for removal of the danger at a time when it could easily have done so, it makes sense to hold it at least partially responsible as a legal matter for injuries caused by that danger. See Lear Siegler , 819 S.W.2d at 472 (discussing ideas of responsibility and legal causation underlying substantial factor analysis).
Nor is this a case in which Critical Path's negligence simply furnished a condition that caused the JVIC team to be in the wrong place at the wrong time to be injured by a third party's negligence. Instead, as discussed above, Critical Path's negligence caused flammable substances to remain in the line without sufficient time to plan and execute their safe removal before the job began, and the JVIC team was exactly where it was supposed to be to begin the job when they were injured by *553 the ignition of those substances. Thus, the condition cases relied on by Critical Path are not on point.
In Lear Siegler , a mobile sign defect placed the plaintiff repairing it at the particular place and time where he was hit by a sleeping driver; the court held the defect was not a legal cause of the injury because proper operation of the sign would have had no effect on the driver's conduct. 819 S.W.2d at 472. In IHS Cedars , the defendant discharged the plaintiff from mental health treatment, which allowed her to be in the car with another former patient who experienced a psychotic episode while driving and crashed. Because there was no argument that the defendant caused the former patient's episode, the discharge merely created a circumstance leading to the plaintiff's injury and was not a proximate cause. 143 S.W.3d at 801. And in Bell v. Campbell , the court held a prior wreck that was complete did not contribute to the injury of plaintiffs by attracting them to the scene, where they were hit by a drunk driver. 434 S.W.2d 117, 122 (Tex. 1968).
In contrast, the cause of appellees' harm in this case was exactly what Critical Path knew about and failed to prevent despite an opportunity to do so: the danger that flammable hydrocarbons in the line would explode during line work. Rather than causing appellees to be in a place where unrelated danger struck, Critical Path's negligence helped ensure that they would find danger there.
For these reasons, we conclude a reasonable jury could find that Critical Path's negligence in scheduling did not merely furnish a condition for the negligence of others to cause the explosion, but was instead a substantial factor in causing the explosion and injuries. We overrule Critical Path's second issue.
II. The trial court did not abuse its discretion by refusing to give an instruction on new and independent cause.
A. Standard of review and applicable law
In its third issue, Critical Path contends it is entitled to a new trial because the trial court refused to include Critical Path's requested instruction on new and independent cause in the jury charge. A trial court must submit in its charge to the jury all requested questions, instructions, and definitions that are raised by the pleadings and the evidence. See Tex. R. Civ. P. 278 ; E.I. DuPont de Nemours & Co. v. Roye , 447 S.W.3d 48, 56 (Tex. App.-Houston [14th Dist.] 2014, pet. dism'd) (citing Hyundai Motor Co. v. Rodriguez , 995 S.W.2d 661, 663-64 (Tex. 1999) ). The parties have the right to be judged by a jury properly instructed in the law applicable to the case. Crown Life Ins. Co. v. Casteel , 22 S.W.3d 378, 388 (Tex. 2000). The goal is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. Roye , 447 S.W.3d at 56.
To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct. Id. Determining what jury instructions are necessary and proper is within the trial court's discretion. Shupe v. Lingafelter , 192 S.W.3d 577, 579 (Tex. 2006). When a trial court refuses to submit a requested instruction, the issue on appeal is whether the instruction was reasonably necessary to enable the jury to render a proper verdict. Vinson & Elkins v. Moran , 946 S.W.2d 381, 405 (Tex. App.-Houston [14th Dist.] 1997, writ dism'd by agr.). We review the trial court's decision for an abuse of discretion. Shupe , 192 S.W.3d at 579. If the trial court abused its discretion in refusing an instruction and that error "probably caused *554 the rendition of an improper judgment," Tex. R. App. P. 44.1(a), the proper remedy is for the appellate court to reverse the judgment and remand the case for a new trial. Columbia Rio Grande Healthcare, L.P. v. Hawley , 284 S.W.3d 851, 862, 865-66 (Tex. 2009).
Although there may be more than one proximate cause of an injury, a new and independent cause intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause. Stanfield v. Neubaum , 494 S.W.3d 90, 97 (Tex. 2016) (citing Dew v. Crown Derrick Erectors, Inc. , 208 S.W.3d 448, 450 (Tex. 2006) (plurality op.)). A new and independent cause thus supersedes the defendant's negligence by destroying the causal connection between that negligence and the plaintiff's harm, precluding the plaintiff from establishing that the defendant's negligence was a proximate cause of the plaintiff's damages. Id. A concurring cause, in contrast, cooperates with the defendant's still-persisting original negligence in bringing about the injury, leaving the causal connection between the defendant's negligence and the plaintiff's harm intact. Id. at 98 ; Gannett Outdoor Co. of Tex. v. Kubeczka , 710 S.W.2d 79, 85 (Tex. App.-Houston [14th Dist.] 1986, no writ).
"What generally distinguishes a superseding cause from one that merely concurs in the injury is that the intervening force was not only unforeseeable, but its consequences also unexpected." Dew , 208 S.W.3d at 451. Yet even the intervention of an unforeseen cause with unexpected consequences is not sufficient to relieve the defendant from liability if his own negligence has not run its course and actively contributes to the injuries. Bell , 434 S.W.2d at 121-22.[31] A new and independent cause: alters the natural sequence of events; causes an injury that would not otherwise have occurred; is not brought into operation by the defendant's original wrongful act or omission; and operates entirely independently of that act or omission. Hawley , 284 S.W.3d at 857.
In determining when an intervening force rises to the level of a new and independent or superseding cause, Texas courts have considered the factors set out in section 442 of the Restatement (Second) of Torts:
(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
*555 (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.
Restatement (Second) of Torts § 442 (1965) (hereinafter "Restatement"). The first four factors "generally parse[ ] the core principles already discussed-that a superseding cause ordinarily involves the intervention of an unforeseen, independent force from a third party, causing injury different from that which might have been expected at the time of the original negligent act." Dew , 208 S.W.3d at 451-52. The last two factors are not relevant when, as here, the intervening act is not intentional or criminal. Id. ; see Restatement §§ 447-449.
In certain situations, the Restatement replaces these factors with bright-line rules that an intervening force is not a superseding cause. Two such rules are relevant here. First, "[w]here the intervening act's risk is the very same risk that renders the original actor negligent, the intervening act cannot serve as a superseding cause." Dew , 208 S.W.3d at 453 ; see also Hawley , 284 S.W.3d at 858 (concluding doctors' alleged culpability in failing to inquire about report "did not change the risk" of non-treatment created by defendant hospital's failure to notify doctors of report). Put another way, where the defendant's negligence creates or increases the risk of harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force generally does not relieve the defendant of liability. Restatement § 442B.
Second, where the defendant's negligence creates or increases the foreseeable risk of harm through the intervention of another force, the defendant is not relieved of liability by the fact that the risk to which he subjected the plaintiff has indeed come to pass. Restatement § 442A; Dew , 208 S.W.3d at 453. Similarly, if the likelihood that a third person may act in a particular manner is one of the hazards that makes the defendant negligent, that act (even if criminal or intentional) does not prevent the defendant from being liable. Restatement § 449. Thus, where the original negligence enables the intervening force to occur and contributes to the resulting harm, the intervening force is a concurring cause. Stanfield , 494 S.W.3d at 99 ; see also Dew , 208 S.W.3d at 453 (concluding intervening act that "exploited th[e] inadequacy" created by defendant's negligence "did not fundamentally alter the foreseeable consequences of [defendant's] original negligence").
A new and independent cause is not an affirmative defense but a matter for the jury to consider in determining the existence or non-existence of proximate cause. Stanfield , 494 S.W.3d at 97 n.6. An additional instruction is necessary when the evidence in the case raises a fact issue on new and independent cause. Dew , 208 S.W.3d at 451 ; Dallas Ry. & Terminal Co. v. Bailey , 151 Tex. 359, 250 S.W.2d 379, 384 (1952) (holding when pleadings and evidence raise issue of new and independent cause, "the trial court's definition of proximate cause must include the element of new and independent cause," which "must itself be defined"). Critical Path requested the following instruction: " 'Proximate cause' means a cause, unbroken by any new and independent cause, that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred."[32]
*556 The trial court did not include the italicized language in the charge.
B. The greatest relief Critical Path can receive based on its briefing regarding new and independent cause is a new trial.
In its brief of appellant, Critical Path argues that the trial court abused its discretion in refusing to give the requested instruction on new and independent cause because evidence of such causes was admitted at trial. If that instruction was raised by the evidence and its omission was harmful, Critical Path would be entitled to reversal of the judgment and a new trial (see Hawley , 284 S.W.3d at 865-66 ), and it requested that relief in its brief. Not until its post-submission brief did Critical Path argue that we should review the legal sufficiency of the evidence as if an instruction on new and independent cause had been given because that instruction was improperly refused. Arguments not raised at the appellate level until a post-submission brief are waived, even if such arguments were preserved in the trial court. E.g., Nip v. Checkpoint Sys., Inc. , 154 S.W.3d 767, 772 n.3 (Tex. App.-Houston [14th Dist.] 2004, no pet.).
Our dissenting colleague nevertheless constructs an argument that we should render a take-nothing judgment because there is undisputed evidence of superseding causes, and thus there is legally insufficient evidence that Critical Path's negligence proximately caused appellees' injuries. According to the dissent, because superseding cause is an element to be considered in determining the existence of proximate cause, it is proper to consider the issue in a legal sufficiency review of the proximate cause element.
The dissent's reasoning is contrary to the general rule that we review the sufficiency of the evidence based on the charge as given, which in this case lacked an instruction on new and independent (or superseding) cause. See Osterberg v. Peca , 12 S.W.3d 31, 55 (Tex. 2000). Critical Path did not urge us to depart from that rule in its brief of appellant. Instead, in the eight pages it devoted to challenging the legal sufficiency of appellees' causation evidence, Critical Path argued that its negligence was too attenuated from appellees' injuries to be a substantial factor in bringing about the harm-the argument we addressed in Part I.C. above. Only in one sentence did Critical Path allude to new and independent cause, and that sentence did not ask us to review the legal sufficiency of the evidence against the charge that should have been given.[33] Consistent with our adversary system of justice, we leave it to "the parties to frame the issues for decision" and confine ourselves to "the role of neutral arbiter of the matters that the parties present." Ward , 484 S.W.3d at 453.
Even if Critical Path had chosen to frame its appellate complaint regarding new and independent cause as a sufficiency *557 challenge rather than a challenge to the trial court's refusal to give the instruction, the first question would still be whether Critical Path showed that the evidence supported such an instruction. See Berkel & Co. Contractors, Inc. v. Lee , No. 14-15-00787-CV, 543 S.W.3d 288, 297-98, 2018 WL 1403545, at *6 (Tex. App.-Houston [14th Dist.] Jan. 23, 2018, no pet.) (explaining that when party raises related charge error and sufficiency complaints, court must first determine whether charge was erroneous).[34] If so, the greatest relief Critical Path could obtain is the new trial it requested in its brief of appellant. See Zaidi v. Shah , 502 S.W.3d 434, 445 (Tex. App.-Houston [14th Dist.] 2016, pet. denied) ("As a general rule ..., we can grant parties less relief than requested, but we cannot grant more."). We therefore consider whether it is entitled to that relief.
C. Because the suggested intervening acts and omissions risk the same harm and are the very hazard that made Critical Path's scheduling failure negligent, they are not new and independent causes.
In arguing that the trial court abused its discretion by refusing an instruction on new and independent cause, Critical Path again points to two allegedly unforeseeable intervening acts or omissions: (1) Valero's decision in the field to change Rainer's March 4 plan for isolating and cleaning the south flare line and further failures by Valero and others to follow safety policies; and (2) the failure of all involved to stop the work once the south flare started smoking and flaming. We conclude neither circumstance provides evidence of a new and independent cause. The failure of other parties to complete the isolation and cleaning tasks that Critical Path breached its obligation to schedule is a concurring cause, not a superseding cause.
First, the risk of harm created by Critical Path's negligent failure to review Valero's policies regarding line isolation and decontamination, request plans for the tasks those policies required, and schedule those tasks for the south flare line is the same as the risk created by the suggested intervening acts and omissions: that work would begin on the line while it was still contaminated with flammable substances and a fire would result. See Hawley , 284 S.W.3d at 858 ; Dew , 208 S.W.3d at 453 ; Restatement § 442B. Critical Path and our dissenting colleague contend that Valero and other parties also failed to follow the safety policies, and Critical Path could hardly have foreseen that others would ignore the very same policies it was ignoring. Even if that argument were correct (which we doubt), no one disputes that the general danger of fire was a foreseeable result of failing to remove flammable substances from the line as required by the safety policies, and a defendant need not foresee the particular manner in which *558 harm occurs.[35] Because the record does not show that these other parties intentionally harmed the plaintiffs, and their acts and omissions "did not change the risk" created by Critical Path's negligence, those acts and omissions do not relieve Critical Path of liability. Hawley , 284 S.W.3d at 858 ; see Restatement § 442B.
Second, the hazard that made Critical Path's failure to schedule the required isolation and decontamination tasks negligent was that the third parties responsible for completing the tasks on Critical Path's schedule would not isolate and clean the line before beginning work. See Restatement § 449. The record shows that Critical Path prepared the schedule for third parties to use in performing the work. Given the nature of Critical Path's duties and its role in the turnaround, the intervention of third parties was not merely foreseeable or likely, it was certain. In preparing the schedule, the record shows that Critical Path was instructed to consult Valero's policies and had a duty to schedule the tasks they required, including every detail of the work to be done. Thus, it was also foreseeable that Valero and others performing the work would rely on Critical Path to include those tasks on the schedule. Their own failure to follow those policies simply "exploited th[e] inadequacy" of Critical Path's schedule; it "did not fundamentally alter the foreseeable consequences" of Critical Path's original negligence. Dew , 208 S.W.3d at 453 ; see also Stanfield , 494 S.W.3d at 99. Because Critical Path's negligence in failing to schedule those tasks increased the foreseeable risk of harm through the intervention of third parties, and was a substantial factor in causing the harm as explained in Part I.C. above, that intervention is not a superseding cause. See Restatement § 442A.
Third, Critical Path's negligence-the failure to schedule the required isolation and cleaning tasks for the south flare line-had not run its course and come to rest at the time of the explosion. Instead, as discussed in Part I.C., the record shows an uninterrupted natural sequence of events beginning with Critical Path's failure to schedule the necessary isolation and cleaning tasks by November 2011, continuing through its failure to schedule predecessor tasks for-and identify the isolation problem with-the March 4, 2012 plan, and ending with the explosion and injuries on March 6. See Bell , 434 S.W.2d at 121-22 ; cf. Stanfield , 494 S.W.3d at 99 ("An intervening cause supersedes the original negligence when it alters the natural sequence of events, ... [is] not brought into operation by the original wrongful acts of the defendant, and operates entirely independently of the defendant's negligent act or omission." (internal quotation marks omitted)).
Each of these three conclusions is an independently sufficient reason that Critical Path was not entitled to an instruction on new and independent cause. To the extent that the Restatement factors are *559 also relevant, they do not support a different result. The suggested intervening forces brought about the same kind of harm as Critical Path's failure to schedule the isolation and decontamination tasks required to remove flammable substances from the south flare line: a fire that injured people working on the line. See Restatement § 442(a). Viewed in hindsight, the operation of these third-party forces in bringing about the harm was not extraordinary; the turnaround process was designed to have third parties follow the schedule Critical Path created. See Restatement §§ 435(2), 442(b).[36] Far from operating independently of any situation created by Critical Path's negligent scheduling, the third parties' performance of the work scheduled is what made Critical Path's omissions from the schedule hazardous. See Restatement §§ 442(c) & cmt. c, 449.
We agree with Critical Path and the jury that there is evidence the third-party forces included wrongful and culpable acts and omissions. See Restatement § 442(d)-(f). Our dissenting colleague is likewise correct that there is evidence at least some people working for Valero knew of the need to perform isolation and decontamination, and some knew those steps had not been performed, which supports the jury's finding that Valero was also negligent.[37] But the Restatement makes clear that a negligent failure by a third party to prevent harm threatened by the defendant's negligence is not a superseding cause of the harm. Restatement § 452(1); see id. cmt. b ("If the third person is under a duty to the other to take such action, his failure to do so will subject him to liability for his own negligence, which is concurrent with that of the actor, for the resulting harm which he has failed to prevent; but his failure to perform his duty does not relieve the original actor of liability for the results of his own negligence."). In addition, the acts and omissions of a third party-whether negligent, intentionally tortious, or even criminal-do not prevent the defendant from being liable if that conduct is, as here, one of the hazards that makes the defendant negligent. Restatement §§ 442 cmts. f-g, 449. In any event, the record does not show intentional or criminal harm or a change in the risk created by Critical Path's negligence, so factors d through f carry little weight on this record. See Hawley , 284 S.W.3d at 858 (concluding culpable acts and omissions of third parties were not superseding cause where they did not change risk created by defendant's actions); Dew , 208 S.W.3d at 452 (noting considerations in factors e and f not relevant *560 where intervening forces not intentional or criminal).
Critical Path argues that our decision in Arguelles also supports its position regarding new and independent cause. On that issue, we held in Arguelles that the plant owner's decision to switch off an automatic safety valve despite knowing that a tank was overpressurized was a new and independent cause that superseded the defendant's liability for failing to install additional monitors and alarms. We pointed out that the owner's conduct, which violated the law and willfully disregarded the safety of its employees, was independent of any negligence by the defendant. 222 S.W.3d at 728-30.
In contrast, this case does not involve an intentional tort by third parties, and Critical Path knew those parties would intervene by using its schedule to prepare the south flare line for work, which is what made its scheduling failure hazardous. Although Valero had general policies and procedures regarding flare switching, pipe purging, and line opening, it hired Critical Path to schedule every detail of the particular job being done on the south flare line. One of Critical Path's responsibilities was to understand Valero's policies and procedures as necessary to identify predecessor tasks for the job, request plans, and put the planned work on the schedule. Indeed, Valero twice instructed Rivers to obtain information on policies and procedures from Valero operations personnel, but he did not do so. Had Rivers followed Valero's instructions and used the information he obtained to schedule the necessary tasks, the record here-unlike in Arguelles -does not indicate that Valero would have ignored those tasks.[38] To the contrary, both Hodges and Rainer were upset when they learned-just before crews showed up for the south flare line job-that time to complete the predecessor tasks of isolation and decontamination had not been scheduled. Thus, Critical Path has not shown that the record supported the submission of its requested instruction.[39]
For these reasons, the trial court did not abuse its discretion in refusing to give an instruction on new and independent cause. Yet even if the trial court had abused its discretion, its omission of the instruction probably did not harm Critical Path because the jury was asked to apportion responsibility among the various parties it found negligent.[40] See Tex. R. App. P. 44.1(a). A plaintiff's or defendant's negligence cannot give rise to a new and independent cause barring recovery; rather, the effect of that negligence *561 is determined under the proportionate responsibility statute. Biaggi v. Patrizio Rest., Inc. , 149 S.W.3d 300, 305-06 (Tex. App.-Dallas 2004, pet. denied) (citing Motsenbocker v. Wyatt , 369 S.W.2d 319, 324-25 (Tex. 1963) ; J.S. Abercrombie Co. v. Delcomyn , 134 Tex. 490, 135 S.W.2d 978, 980-81 (1940) ); see Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (West 2015). Although some of the parties submitted in the proportionate responsibility question were no longer defendants due to settlement, their inclusion gave Critical Path the opportunity to argue-largely effectively-its theory that their negligence was wholly responsible for appellees' injuries. "[I]t is hard to see how a new-and-independent-cause instruction would have made it any easier for jurors to blame someone else." Dew , 208 S.W.3d at 454 (Brister, J., concurring) (concluding defendant's theory "that the accident was someone else's fault" was "adequately presented in the comparative negligence portion of the charge," and therefore omitting the instruction "could have made no difference to a jury"). Accordingly, Critical Path is not entitled to a new trial, and we overrule its third issue.
III. Sufficient evidence supports most, but not all, of the challenged awards of damages.
Critical Path contends in its fourth issue that some of the damages found by the jury are not supported by legally sufficient evidence and that other damages are not supported by factually sufficient evidence. Critical Path argues that the damage awards it challenges must be set aside in their entirety or reversed and a new trial ordered. Alternatively, Critical Path asks that we suggest a remittitur. We first address Critical Path's challenges to the economic damages found by the jury and then turn to its challenges to the non-economic damages. Because some of the damage awards are not supported by the evidence, we sustain this issue in part and overrule it in part.
A. Standard of review
We review the legal and factual sufficiency of the evidence supporting awards of damages under the standards set out in Part I.A. of this opinion. When a party argues on appeal that the damages awarded by the jury are excessive, we review the evidence for factual sufficiency. PNS Stores, Inc. v. Munguia , 484 S.W.3d 503, 511 (Tex. App.-Houston [14th Dist.] 2016, no pet.). A court of appeals may exercise its authority to suggest a remittitur when there is insufficient evidence to support the full amount of damages awarded but sufficient evidence to support a lesser award. Tex. R. App. P. 46.3 ; PNS Stores, Inc. , 484 S.W.3d at 513. The prevailing party in the trial court then has the option to accept the remittitur or have the case remanded for a new trial. PNS Stores, Inc. , 484 S.W.3d at 513.
Under Texas law, "whether to award damages and how much is uniquely within the factfinder's discretion." Golden Eagle Archery, Inc. v. Jackson , 116 S.W.3d 757, 772 (Tex. 2003). "When someone suffers personal injuries, the damages fall within two broad categories-economic and non-economic damages." Id. at 763. Economic damages are generally those that compensate an injured party for lost wages, lost earning capacity, and medical expenses. Id. Non-economic damages provide compensation for an injured party's pain, suffering, mental anguish, disfigurement, and physical impairment. Id. Physical impairment encompasses the loss of the injured party's former lifestyle. Id. at 772.
The jury has broad discretion to award damages within the range of the evidence presented at trial.
*562 MEMC Pasadena, Inc. v. Riddle Power, LLC , 472 S.W.3d 379, 408 (Tex. App.-Houston [14th Dist.] 2015, no pet.). A jury does not have to rely solely on an expert's opinion in calculating damages unless the subject matter requires expert testimony to be understood. Bayer Corp. v. DX Terminals, Ltd. , 214 S.W.3d 586, 606 (Tex. App.-Houston [14th Dist.] 2006, pet. denied). Although some damages in personal injury cases are not subject to precise mathematical calculation, a jury must have an evidentiary basis for its damage awards. Salinas v. Rafati , 948 S.W.2d 286, 289 (Tex. 1997) ; Weidner v. Sanchez , 14 S.W.3d 353, 372 (Tex. App.-Houston [14th Dist.] 2000, no pet.). In other words, a jury cannot simply pick a number and put it in the blank. Saenz v. Fid. & Guar. Ins. Underwriters , 925 S.W.2d 607, 614 (Tex. 1996).
B. Future medical expenses
To recover future medical expenses, a plaintiff must provide evidence showing a reasonable probability that medical expenses will be incurred in the future and the probable amount of those expenses. Gunn v. McCoy , 489 S.W.3d 75, 112 (Tex. App.-Houston [14th Dist.] 2016, pet. granted). The preferred method to establish future medical expenses is through expert medical testimony, but "no precise evidence is required to support an award for future medical costs." Id. As with other types of personal injury damages, it is within the jury's sound discretion to determine what amount, if any, to award in future medical expenses. Id. This standard of review does not mean, however, that a reviewing court will uphold a jury award for future medical expenses when there is no evidence. Id.
1. The jury's award to Daniel for future medical expenses is excessive.
The jury awarded Daniel $6,300,000 for his past medical expenses. Critical Path has not challenged this award on appeal. The jury also found that Daniel's future medical expenses would total $13,000,000.[41] Critical Path argues that factually insufficient evidence supports this amount. In particular, Critical Path points to testimony of appellees' medical expert, Dr. Lichtblau, supporting the conclusion that Daniel's future medical expenses would be $7,964,298-over $5,000,000 less than the jury ultimately awarded.[42]
Dr. Lichtblau testified during trial that he did not include any costs for medical complications that might arise in the future because he is not allowed to speculate on future medical costs.[43] Dr. Lichtblau did testify that since he evaluated Daniel's future medical needs, Daniel had developed a bone infection. Dr. Lichtblau went on to *563 discuss how such an infection would be treated. He did not, however, testify as to the future costs of that treatment. Finally, Dr. Lichtbau testified that his projection of Daniel's future medical costs did not include the cost of modifying his home to make it wheelchair accessible. According to Dr. Lichtblau, these modifications would cost between $100,000 and $200,000. He also testified that it did not include the cost of an electric wheelchair, which Daniel would need to replace every three to five years. This cost, over the course of Daniel's projected lifespan, would total $180,000.
Appellees respond that the evidence is sufficient because the jury could have based its $13,000,000 award on Daniel's past medical expenses combined with Dr. Lichtblau's testimony regarding potential complications that Daniel might experience. Appellees also point out that expert medical evidence is not required for a jury to award future medical expenses and that all a plaintiff need do is demonstrate "a reasonable probability that such medical expenses will be incurred in the future." Whole Foods Market Sw., LP v. Tijerina , 979 S.W.2d 768, 781 (Tex. App.-Houston [14th Dist.] 1998, pet. denied).
We conclude that the jury's $13,000,000 award for future medical care expenses is not supported by factually sufficient evidence and is therefore excessive. Although a jury can base an award of future medical expenses on the past medical expenses a plaintiff has incurred, Daniel's past medical expenses of $6,300,000 cannot alone provide evidentiary support for an award of future medical expenses of $13,000,000. Possible future complications cannot make up the difference either because Dr. Lichtblau testified that these complications and the costs to treat them are unpredictable and speculative. See Hong v. Integrated Eng'g, Inc. , No. 14-06-00579-CV, 2008 WL 660650, at *4 (Tex. App.-Houston [14th Dist.] March 11, 2008, pet. denied) (mem. op.) ("The Texas Supreme Court has held that conclusory or speculative opinion testimony is incompetent evidence and cannot support a judgment.") (internal quotations omitted); Bill Miller Bar-B-Q Enters., Ltd. v. Gonzales , No. 04-04-00747-CV, 2005 WL 2176079, at *3 n.4 (Tex. App.-San Antonio Aug. 24, 2005, pet. denied) (mem. op.) (concluding evidence did not support future medical expense award because doctor's testimony did not show that there was reasonable probability plaintiff would need future back surgery). Because there is sufficient evidence to support some, but not all, of the future medical expenses awarded, we suggest a remittitur of future medical expenses of $4,655,702 to a total of $8,344,298.[44] PNS Stores, Inc. , 484 S.W.3d at 513-14. If appellees do not accept the remittitur, the judgment will be reversed in part and Daniel's claim remanded for a new trial. Id.
2. Factually sufficient evidence supports the jury's award to Richard for future medical expenses.
Critical Path also challenges the future medical expenses awarded to Richard. The jury found that Richard's past medical expenses totaled $18,300. Critical Path has not challenged this award on appeal. The jury also found that Richard's future medical expenses would be $100,000. Critical Path uses the medical expert testimony of Richard's treating physician, Dr. Berliner, to attack this finding. According to Critical Path, Dr. Berliner testified that Richard had neck and *564 back injuries that would require a total of six injections at a cost of $7,000 each, a total future cost of $42,000. As a result, Critical Path asserts that the evidence is factually insufficient to support the jury's award of $100,000.
Appellees respond that the evidence is sufficient to support the jury's award of future medical expenses. They rely on not only Dr. Berliner's testimony regarding the future treatment of Richard's back and neck injuries, but also on evidence that the explosion caused Richard to experience severe post-traumatic stress disorder with depressive symptoms and that he needed future psychological care as a result. Based on this evidence, as well as evidence from Drs. Tarbox and Phelps regarding the cost of psychological care for a patient diagnosed with severe post-traumatic stress disorder, a reasonable jury could find that Richard would need future psychological care with a present value of $58,000. See Day v. Domin , No. 05-14-00467-CV, 2015 WL 1743153, at *5-6 (Tex. App.-Dallas April 16, 2015, no pet.) (mem. op.) (observing that a jury must often "extrapolate an award of future medical damages from proof of other matters").
3. Factually sufficient evidence supports the jury's award to Torres for future medical expenses.
Critical Path next challenges the factual sufficiency of the evidence supporting the jury's award of $2,700,000 for Torres's future medical expenses. Critical Path argues that this award exceeds the amount of future medical expenses that Dr. Lichtblau testified Torres would incur by $700,000. We disagree. Dr. Mayor, an economist, testified that the present value of Dr. Lichtblau's lifecare plan for Torres was $3,707,595. We conclude that sufficient evidence supports the amount found by the jury for Torres's future medical care expenses. See Ochoa-Cronfel v. Murray , No. 03-15-00242-CV, 2016 WL 3521885, at *6 (Tex. App.-Austin June 22, 2016, no pet.) (mem. op.) (affirming future award of medical expenses significantly below amount medical expert opined plaintiff would incur).
4. Factually sufficient evidence supports the jury's award to Smith for future medical expenses.
Finally, Critical Path challenges the factual sufficiency of the evidence supporting the jury's award of future medical expenses to Smith. The jury found that Smith's past medical expenses totaled $26,000. Critical Path has not challenged this award on appeal. The jury then found that Smith would incur $75,000 in future medical expenses. Critical Path argues this amount is not supported by the medical expert testimony of Smith's treating physician, Dr. Berliner, who testified that Smith would need various treatments costing a total of $29,600.
Appellees respond that the evidence is sufficient to support Smith's award of future medical expenses. They rely not only on Dr. Berliner's testimony regarding the future treatment of Smith's back and head injuries, but also on evidence that, as a result of the explosion, Smith has experienced serious psychological issues, including post-traumatic stress disorder, flashbacks, and nightmares. Both Smith and Dr. Berliner testified that he needed continuing psychological treatment. Based on this evidence, as well as the testimony of Drs. Tarbox and Phelps regarding the cost of psychological care for a patient diagnosed with severe post-traumatic stress disorder, a reasonable jury could find that Smith would need future psychological care costing $45,400. See Day , 2015 WL 1743153, at *5-6 (observing that a jury *565 must often "extrapolate an award of future medical damages from proof of other matters").
C. Loss of future earning capacity
Critical Path next contends the evidence is insufficient to support the jury's awards of damages for loss of future earning capacity to Richard and de los Santos. Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after the trial. Plainview Motels, Inc. v. Reynolds , 127 S.W.3d 21, 35 (Tex. App.-Tyler 2003, pet. denied). Although the amount of money a plaintiff might earn in the future is always uncertain, he must offer evidence sufficient to allow the jury to measure earning capacity reasonably in monetary terms. Id. at 35-36. An award for loss of future earning capacity may be based on a composite of factors that affect a person's capacity to earn a living. Id. at 36. The plaintiff may support an award with "evidence of past earnings; the plaintiff's stamina, efficiency, and ability to work with pain; the weaknesses and degenerative changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy." Id. There must also be evidence that the plaintiff had the capacity to work before the injury and that his capacity was impaired as a result of the injury. Id.
1. Factually sufficient evidence supports the jury's award to Richard for loss of future earning capacity.
The jury awarded Richard $300,000 for past and $1,000,000 for future loss of earning capacity. Critical Path challenges only the factual sufficiency of the evidence supporting the latter award, citing conflicting expert testimony regarding Richard's future earning capacity. All witnesses agreed that Richard would be able to return to work in the future. Their disagreement concerned the type of work Richard would be able to do and the amount that he would be able to earn once he did return to work.[45] The jury heard this conflicting evidence and determined that the present value of Richard's loss of future earning capacity was $1,000,000, a figure less than the amount Critical Path's own expert testified was the present value of Richard's loss of future earning capacity. We hold the evidence is factually sufficient to support the jury's award. See Barnhart v. Morales , 459 S.W.3d 733, 747 (Tex. App.-Houston [14th Dist.] 2015, no pet.) (noting that jury's choice to "resolve[ ] any conflicts or inconsistencies in the evidence against [appellant] does not render the evidence factually insufficient"); Stewart & Stevenson, LLC v. Foret , No. 01-11-01032-CV, 2013 WL 4337319, at *14 (Tex. App.-Houston [1st Dist.] August 15, 2013, no pet.) (mem. op.) (rejecting argument evidence insufficient to support $2,000,000 future loss of earning capacity award in part because experts considered possibility injured plaintiff could return to work in some capacity).
2. Factually sufficient evidence supports the jury's award to de los Santos for loss of future earning capacity.
The jury awarded de los Santos $283,000 for past and $1,100,000 for future *566 loss of earning capacity. Critical Path again challenges only the latter award. As they did with respect to Richard, the two vocational experts agreed that de los Santos would be able to return to work but disagreed on the type of work he could handle and the amount of earnings he would receive once he did return to work. Using the prediction of Critical Path's vocational expert regarding de los Santos's future earnings, Critical Path's economist opined that the present value of de los Santos's loss of future earning capacity was $738,480. Appellees' economist Dr. Mayor used the prediction of appellees' vocational expert and testified that the present value of de los Santos's loss of future earning capacity was $1,360,351. Because the jury's award of $1,100,000 is within this range, we conclude that factually sufficient evidence supports the jury's award to de los Santos for loss of future earning capacity. See Barnhart , 459 S.W.3d at 747.
D. Factually sufficient evidence supports the jury's award for loss of household services to Blanca Rodriguez, Torres's wife.
Critical Path also challenges the factual sufficiency of the evidence supporting the jury's finding that Blanca Rodriguez, Torres's wife, sustained damages of $3,810 for loss of household services in the past and $61,444 for loss of household services in the future.[46] The jury charge defined "household services" as "the performance of household and domestic duties by a spouse to the marriage." A claim for loss of household services is derivative in nature, which means Rodriguez must first prove that Torres suffered serious, permanent, and disabling injuries. Lanier v. Eastern Found., Inc. , 401 S.W.3d 445, 456 (Tex. App.-Dallas 2013, no pet.). Critical Path does not dispute that Torres suffered such injuries as a result of the explosion. Instead, Critical Path argues that Rodriguez did not testify in sufficient detail about the "particular chores or services that her husband performed" before the explosion. Critical Path also complains that there is no testimony regarding the value of the lost services or the duration of Torres's inability to perform household services in the future.
Rodriguez testified that she had "to take over a lot of the responsibilities that [Torres] had to do around the house," including working around the house and mowing the yard. Rodriguez also testified that Torres tries to help but is physically unable to do so as a result of his injuries. Torres himself testified about his inability to do the type of household chores that he had performed previously. According to Torres, "my mind wants to-do more, but I just can't. My leg doesn't let me. My body doesn't let me. My mind thinks that I'm capable of doing it, but my body doesn't let me. I can't." Torres also testified regarding his doubt about his ability to do these types of things ten and twenty years in the future. In addition to hearing about Torres's physical injuries and their long-term impact, the jury also heard Torres's psychologist testify regarding the severe psychological impact the explosion has had on him. According to Dr. Phelps, it is very difficult for Torres "to recognize that he's now not only physically disabled but emotionally disabled, as well. And that's a really hard pill to swallow."
Under Texas law, juries can apply their own knowledge and experience to estimate the value of household services that would have been rendered by the injured person even without proof of their value. See *567 Badall v. Durgapersad , 454 S.W.3d 626, 638 (Tex. App.-Houston [1st Dist.] 2014, pet. denied) (addressing loss of household services damages in wrongful death case); Excel Corp. v. McDonald , 223 S.W.3d 506, 510 (Tex. App.-Amarillo 2006, pet. denied) (same). "Where there is proof in the records of the nature of the household services rendered before the injuries and proof that the injuries have impaired a person's capacity to perform household services in the future, the evidence is sufficient to sustain an award for future loss of household services." Six Flags Over Tex., Inc. v. Parker , 759 S.W.2d 758, 762 (Tex. App.-Fort Worth 1988, no writ.). We hold the evidence is factually sufficient to support the jury's award of past and future damages for loss of household services to Rodriguez.
E. Sufficient evidence supports the jury's award for pecuniary loss to Mr. and Mrs. Cuevas.
Critical Path challenges the legal and factual sufficiency of the evidence supporting the jury's award of pecuniary damages to Nico's parents, Nicolas and Maria Cuevas. The jury awarded Mr. Cuevas $7,000 in past and $36,000 in future damages for pecuniary loss, and it awarded Mrs. Cuevas $14,000 in past and $71,000 in future damages, for a total of $128,000. Critical Path argues there is no evidence to support an "award of any amount to the parents."
The jury charge defined "pecuniary loss" as "the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that[ ] Nicolas Cuevas and Maria Cuevas, in reasonable probability, would have received from Nicolas Oscar Cuevas had he lived." See Moore v. Lillebo , 722 S.W.2d 683, 687 (Tex. 1986). Critical Path did not object to this definition. We therefore measure the sufficiency of the evidence against the charge as given. Osterberg , 12 S.W.3d at 55.
"Pecuniary loss in a wrongful-death case is not subject to precise mathematical calculation, and the jury is given significant discretion in determining this element of damages." Christus Health v. Dorriety, 345 S.W.3d 104, 113 (Tex. App.-Houston [14th Dist.] 2011, pet. denied). Pecuniary losses may be recovered even in the absence of specific evidence of the amount of contributions the decedent made before his death or that he would have continued to make in the future. Id. Thus, a jury determining pecuniary loss may look beyond evidence of calculable financial contributions. Id.
In this case, the jury heard evidence that Nico made certain his parents had everything they needed. Nico regularly helped his parents financially. For example, he sent money home on a regular basis and stocked his parents' refrigerator with food whenever he was home. Nico also made certain that his mother's personal needs were met, including buying her clothing. In addition, Nico and his brother Daniel bought their parents a new car to replace their mother's old one. We conclude that based on this evidence, a reasonable jury could find that Mr. and Mrs. Cuevas's pecuniary loss in the past was $21,000 and the pecuniary loss they would reasonably sustain in the future was $107,000. The evidence is therefore legally and factually sufficient to support the jury's award.
F. Factually sufficient evidence supports the jury's awards of non-economic damages to Daniel and Torres.
The jury awarded Daniel a total of $67,000,000 in non-economic damages. In particular, the jury found the following elements of damages: (1) $5,000,000 for physical pain sustained in the past; (2) $10,000,000 for physical pain that will be *568 sustained in the future; (3) $5,000,000 for mental anguish sustained in the past; (4) $10,000,000 for mental anguish that will be sustained in the future; (5) $5,000,000 for disfigurement sustained in the past; (6) $10,000,000 for disfigurement that will be sustained in the future; (7) $10,000,000 for physical impairment sustained in the past; and (8) $12,000,000 for physical impairment that will be sustained in the future. Based on the jury's finding that Critical Path was responsible for six percent of the harm, Daniel's award was reduced to a total of $4,020,000.
Torres was awarded a total of $25,200,000 in non-economic damages. The elements found by the jury were: (1) $2,000,000 for physical pain sustained in the past; (2) $3,500,000 for physical pain that will be sustained in the future; (3) $2,000,000 for mental anguish sustained in the past; (4) $6,000,000 for mental anguish that will be sustained in the future; (5) $2,000,000 for disfigurement sustained in the past; (6) $3,700,000 for disfigurement that will be sustained in the future; (7) $2,000,000 for physical impairment sustained in the past; and (8) $4,000,000 for physical impairment that will be sustained in the future. Based on the jury's finding that Critical Path was responsible for six percent of the harm, Torres's award was reduced to a total of $1,512,000.
Critical Path asserts these awards are excessive and must be remitted. Although Critical Path recognizes that "no amount of money can truly compensate a plaintiff for some injuries," it insists that "[t]his Court must assume the difficult task of objectively reviewing the compensatory damage awards, comparing them to other awards, and suggesting a remittitur to a fair and reasonable amount of damages...." But it is Critical Path's obligation to brief its challenge to those awards adequately. Critical Path does not examine the evidence relevant to each element of damages found by the jury, nor does it attempt to explain why the evidence is insufficient to support each of the jury's awards or what fair amounts would be. Instead, Critical Path provides a string cite to cases not applying Texas law and argues that because it was unable to find "another case in which [total] non-economic damages awards equal to either of these amounts were allowed to stand," the awards are excessive.
We agree that, in appropriate circumstances, awards in similar cases can be relevant in analyzing whether an award of damages is excessive. But Critical Path does not attempt to apply the factors identified in the cases it cites and explain whether they show that the awards in this case are excessive. Moreover, before we can determine that an award is excessive, we must examine the evidence. See Gonzalez, 195 S.W.3d at 681 (holding that when court of appeals determines evidence is factually insufficient, it must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict). Each case must be measured by its own facts, and the jury has considerable discretion to resolve the speculative matters of pain and suffering, mental anguish, disfigurement, and physical impairment, and to decide the amount of damages for each category. Weidner , 14 S.W.3d at 367, 372.
1. Daniel
"Where serious bodily injury is inflicted, ... we know that some degree of physical and mental suffering is the necessary result." Id. at 367 (quoting City of Tyler v. Likes , 962 S.W.2d 489, 495 (Tex. 1997) (internal quotation marks omitted)). Damages for future physical pain are recoverable if a jury could reasonably infer *569 that the plaintiff will feel physical pain in the future. PNS Stores, Inc. , 484 S.W.3d at 517.
Daniel was 32 years old when the explosion occurred. It is undisputed that Daniel suffered serious bodily injury as a result of the explosion. Daniel experienced third-degree burns over sixty-five percent of his body and was not expected to survive. According to Dr. Hickerson, Daniel's treating physician in the Memphis burn unit, third-degree burns burn completely through the victim's skin. In addition to his burns, Daniel also suffered a broken arm in his fall from the platform that required surgery to repair. Daniel also experienced hearing loss, either directly as a result of the explosion or as a side-effect of the treatment of his injuries.
Abundant evidence is in the record that burn injuries such as those suffered by Daniel and Torres are intensely painful, as is the treatment for them. Daniel testified briefly during the trial. According to Daniel, he remembers that he was working, and then he "hit the ground and was on the ground. And I had my-mask on, and I couldn't breathe. I just felt a lot of pain. And something was burning my body, and-and they told me that-to try to roll over, but I couldn't [due to my broken arm]."
Dr. Tarbox, the psychologist who treated Daniel, testified regarding the pain burn victims generally experience and addressed Daniel's specific circumstances. Dr. Tarbox, who has "seen more burn cases than any psychologist in the United States," testified that "the pain of burns is something horrific." He explained that burns are so intensely painful because ninety percent of a person's pain receptors are in the skin. As a result, burn victims "will tell you horrifically they know they're on fire." According to Dr. Tarbox, the sensation of being burned alive "is beyond what any of us can imagine or want to imagine."
Daniel spent eight months in the Memphis burn unit. During that stay he underwent constant painful treatments, including daily wound care and multiple incisions and skin grafting. Dr. Hickerson explained that third-degree burns require skin grafts to heal. Because so much of Daniel's skin was burned off, they had to harvest skin repeatedly from the same areas. Daniel also had to undergo painful debridement and washing that was necessary to avoid infection. Mrs. Cuevas testified about one of these procedures out of the many that Daniel underwent. The procedure involved taking "the skin off of his chest. When I went to see him, I saw him; and I left immediately crying. I just-I just couldn't see that. And the nurses told me that this is the moment when he was going to need me the most and I had to be there." Mrs. Cuevas went to the hospital chapel "and asked God to give me the strength. When I came back, I did go in to see him; and it was very painful for me because he would ask me, Am I okay? And I had to respond yes to that even though I knew he wasn't."
The ability of the doctors to control Daniel's pain was severely limited because if they gave him the amount of pain medication he needed, it could stop his breathing and kill him. The doctors therefore erred on the side of Daniel experiencing pain. Dr. Hickerson testified that Daniel experienced a significant amount of pain every single day during his time in the burn unit.
There is also abundant evidence that Daniel has continued to experience significant pain since his departure from the Memphis burn unit and will continue to experience significant pain throughout the remainder of his life, which was predicted to extend another 47 years from the time *570 of the trial. According to Dr. Lichtblau, Daniel's "pain experience is constant, always, and will never go away." Dr. Tarbox testified that Daniel is "one of the more severely" and "catastrophically burned patients" that he had ever seen. Finally, Dr. Lichtblau testified that Daniel's future situation "is the worst possible case scenario because the medical profession is very, very limited on what we can do. They did save his life, but now he has to negotiate life. The hardest part is now."
We conclude that the damages found for Daniel's past and future physical pain are supported by factually sufficient evidence. The cases from other states that Critical Path cites in support of its argument that the pain award is excessive do not change this result. As the court explained in one of the cited cases, although "review of verdicts in other cases is useful in determining what constitute reasonable compensation, each case must be evaluated on its own facts." Weigl v. Quincy Specialties Co. , 190 Misc.2d 1, 735 N.Y.S.2d 729, 732 (Sup. Ct. 2001). The court continued that "[m]odification of damages, which is a speculative endeavor, cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible." Id.
The evidence also supports the jury's award of damages to Daniel for mental anguish. Mental anguish is a "relatively high degree of mental pain and distress that is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these." PNS Stores, Inc. , 484 S.W.3d at 517 (quoting Parkway Co. v. Woodruff , 901 S.W.2d 434, 444 (Tex. 1995) ). There must be evidence of the existence of compensable mental anguish as well as evidence to justify the amount awarded. Id. Evidence of the nature, duration, and severity of the mental anguish is required for recovery. Id. To support an award of future damages for mental anguish, a plaintiff must demonstrate a reasonable probability that he will suffer compensable mental anguish in the future. Id.
Dr. Tarbox testified that a burn victim's injuries are psychological as well as physical. Since his injuries, Daniel's mood has changed and he is now depressed, irritable, and angry. Daniel has been diagnosed with chronic post-traumatic stress disorder, depressive disorder, and anxiety disorder. Dr. Tarbox opined that Daniel will suffer from post-traumatic stress disorder his entire life. Dr. Tarbox also testified that Daniel will need intensive therapy his entire life. Daniel also suffers from constant nightmares, including recurring dreams that he is burning alive. We conclude that the evidence is factually sufficient to support the jury's damage awards to Daniel for past and future mental anguish.
Disfigurement is defined as "that which impairs the appearance of a person, or that which renders unsightly, misshapen, or imperfect, or deforms in some manner." Mauricio v. Cervantes , No. 04-16-00260-CV, 2017 WL 2791324, at *3 (Tex. App.-San Antonio June 28, 2017, no pet.). "The matter of future disfigurement is necessarily speculative and there is no mathematical yard stick by which one can measure damages for it." Id. (quoting Tri-State Motor Transit Co. v. Nicar , 765 S.W.2d 486, 494 (Tex. App.-Houston [14th Dist.] 1989, no writ) ).
The jury heard evidence about the difficulties that burn patients experience from their disfiguring injuries. Burn patients must deal with "the visible evidence of being burned," which is a "profound shock" that patients must "live with the rest of their lives." Daniel has disfiguring burns to his head, neck, and upper *571 extremities. Daniel also has severe facial scars from his burns, and there is no plastic surgery procedure that can make him look "normal." Additionally, Daniel's hands are "withered and barely functional." According to Dr. Tarbox, Daniel's hands and other disfiguring injuries are a constant reminder that he is "permanently, irreversibly disabled, and disfigured." We conclude that the evidence is factually sufficient to support the jury's damage awards to Daniel for past and future disfigurement.
Physical impairment, sometimes referred to as loss of enjoyment of life, encompasses the loss of the injured person's former lifestyle. PNS Stores, Inc. , 484 S.W.3d at 514. To receive damages for physical impairment, a plaintiff must prove that: (1) he incurred injuries that are distinct from, or extend beyond, injuries compensable through other damage elements; and (2) these distinct injuries have had a substantial effect on the plaintiff. Id. The focus of this element of damage is not the injuries themselves, but whether the injuries have had a substantial effect on the plaintiff's life activities or functions. Id. at 515.
The record contains abundant evidence that Daniel's life activities and functions have been, and will forever be, disrupted by his injuries. He is routinely bound to a wheelchair because the injuries to his legs are so severe. Although Daniel has worked hard to improve his condition, he can walk only very small distances and even that activity results in new injuries as his leg braces cut through the thin skin on his legs. Daniel's hands are barely functional. There is also evidence that Daniel cannot take care of himself and his mother now lives with him so that she can take care of even his most basic daily needs. Before the explosion, Daniel enjoyed working on, and racing, cars. He has completely lost the ability to participate in this hobby as a result of his injuries. We hold the evidence is factually sufficient to support the jury's damage awards to Daniel for past and future physical impairment.
2. Torres
We examine the factual sufficiency of the evidence supporting Torres's non-economic damages under the same standards set out above with respect to Daniel's non-economic damages. Torres testified at trial. He discussed not only what happened immediately following the explosion, but also his experience during his three months in the Memphis burn unit.
Torres testified that after the explosion, he "felt like [he] was inside a balloon of fire, and everywhere [he] turned there was fire." Torres also explained that he tried to remove his breathing mask and discovered that "it was already getting melted into [his] head." He also saw that his legs, shoulders, and back were on fire and that his gloves started melting into his hands. Torres described his effort to get under the water from the single functioning water cannon and that all he remembered after that was screams and pain. When he arrived at the hospital, Torres kept telling the doctors that he was in pain, over and over again. His chances of survival were slim.
Torres described his three months in the burn unit as "liv[ing] in hell." Dreading the next day, Torres hardly slept at night in the burn unit because he knew that the new day would bring a lot of pain. When Torres's wounddressings were changed, sometimes twice daily, it felt "like they're taking your skin off alive." The hospital staff would then scrub the burned areas of his body to remove the dead skin and it felt "like a wire brush going through your body." Dr. Phelps, Torres's psychologist, *572 explained that many burn patients have the worst pain in recovery and describe their stays in the hospital as excruciatingly painful. Torres's pain has continued since he left the hospital. He testified that the only time his legs are not constantly in pain is when he is asleep, and he needs medication to sleep. Torres also regularly takes hydrocodone for pain. We conclude that the damages found for Torres's past and future physical pain are supported by factually sufficient evidence.
Regarding mental anguish, Torres explained that he was brought into the hospital and laid down close to Nico. Torres heard the doctors tell Nico that they needed to amputate his arms and legs in order for him to have a chance to live. When Torres heard this, he feared that the doctors would have to amputate his own legs, and he "lost it." Torres started "screaming at the doctors for them not to chop my legs off, not to chop my legs off. Please, please don't chop my legs off."
Torres continued to experience mental anguish after he left the hospital. He has frequent flashbacks to the explosion and he spends much of each day thinking about what happened. Torres has been diagnosed with post-traumatic stress disorder and major depression. Dr. Phelps, Torres's psychologist, testified that post-traumatic stress does not go away. Instead, doctor and patient try to manage the symptoms. Dr. Phelps described Torres as emotionally disabled as a result of the explosion. He testified Torres was aware that Daniel appeared to be mentally handling his situation better than Torres.
Torres's relationship with his family has suffered as a result of the explosion and his injuries. He is more distant with his wife and their marriage may not survive the stress caused by his injuries. Torres frequently worries about how he will provide for his family when he experiences so much pain as a result of his injuries. He also experiences frustration and is constantly angry that he cannot interact with his children the way he used to do before he was injured. According to Torres, he is always in a bad mood and frustrated, and he is just not the same person he was before the explosion. We hold that the evidence is factually sufficient to support the jury's damage awards to Torres for past and future mental anguish.
As to disfigurement, Torres was burned on his legs, buttocks, back, and arms during the explosion and fire. He also lost part of his left ear. Torres required skin grafts on his burn wounds and the skin used for those grafts came from other areas of his body, from skin grown in a laboratory, and from cadavers. Torres's body is scarred and areas of grafted skin look different from his unburned skin. When Torres arrived home after his long recovery process, his children were initially shocked by his appearance. Because of his scars, Torres will no longer wear shorts, short-sleeved shirts, or get in a swimming pool. We conclude that the evidence is factually sufficient to support the jury's awards to Torres for past and future disfigurement.
Turning to physical impairment, the record shows that Torres was burned over approximately forty-five percent of his total body area. Many of Torres's burns were fourth-degree burns, which means his skin was completely burned away and the burns extended into his muscles and even into his bones. Torres's worst burns were in his legs as well as his knee and ankle joints. It is difficult for him to walk as a result of these injuries. Torres's ears were also burned, and his hearing was impacted. Additionally, Torres's burns impaired his ability to handle exposure to the sun and regulate his body *573 temperature. Dr. Hickerson testified that Torres's ability to tolerate exposure to the sun should slowly improve over time if he gradually increases the amount of exposure. Dr. Hickerson cautioned that it would be a long process and warned that Torres would never reach his pre-explosion ability to handle the sun. Torres can only sweat on the areas of his skin that were not burned, which negatively impacts his ability to regulate his body temperature.
Before the explosion, Torres was a very active and happy person. He participated in many outdoor activities, spending time on the beach, swimming, boating, fishing, and travelling. Torres also engaged in many social activities, including dancing, attending parties, and barbecues. As a result of his injuries, Torres can no longer participate in many of these activities. He can no longer do yardwork or perform work on his family's house. Torres is also no longer able to spend time with his family outdoors. Before the explosion, his family would take annual vacations that frequently involved amusement parks or locations near the ocean. Torres can no longer fully participate physically in these activities because of his limited ability to handle the sun and heat. Torres's psychological issues resulting from the explosion and injuries also limit his ability to fully participate in his former activities. We hold that the evidence is factually sufficient to support the jury's awards to Torres for past and future physical impairment.
G. Factually sufficient evidence supports the jury's awards of non-economic damages to the estate of Nico Cuevas.
The jury awarded Nico's estate $4,000,000 for the physical pain and $6,000,000 for the mental anguish Nico sustained before his death.[47] Critical Path argues that these awards are excessive and asks this Court to remit them substantially. Once again, though, Critical Path's argument consists entirely of pointing to cases-governed by Texas law this time-involving smaller awards of non-economic damages. Critical Path does not examine the evidence relevant to the damages found by the jury or explain why the evidence is insufficient to support the jury's awards. As discussed above, we must begin with the evidence the jury heard relevant to Nico's pain and mental anguish.
Just before the explosion occurred, Nico was standing by the pipeline holding a large metal gasket. The force of the explosion knocked Nico down on the platform. Nico lay on the platform tangled in the razor-sharp gasket, burning. The water from the single operating water cannon did not reach him, so the fire continued until it burned itself out. De los Santos was the first to reach Nico. He found Nico still conscious. The emergency medical technicians eventually got Nico down off the platform, into an ambulance, and transported to the hospital.
According to Dr. Hickerson, every part of Nico was a deep burn with the exception of his face, a part of the back of his neck, and the bottoms of his feet. Nico's coveralls had burned into his skin. According to Dr. Hickerson, to melt the fabric of the heat-resistant coveralls, the heat had to be tremendous. Nico survived four days before he died as a result of his injuries. Dr. Hickerson testified that they gave Nico pain medication during those four days, but he did not know how well that works in *574 a situation like Nico's. As part of their treatment, the doctors gave Nico large amounts of fluids. This caused Nico's body to swell. Because burned skin does not stretch, the doctors had to make incisions in Nico's arms, legs, and torso to allow the skin to expand.
Jose Lugo, a family friend, traveled to Memphis soon after the explosion. When he arrived at the hospital, Richard asked him to help explain to Mr. and Mrs. Cuevas what had happened. Richard then took Lugo into the room with both Daniel and Nico. Nico was initially behind a curtain. When the nurses moved the curtain, Lugo could see Nico's face where his breathing mask had been. But, "behind his ears and everything, it was-he was in bad shape. He was pretty burned up. And he was also trembling with how much pain he was also going through."
Pain and suffering may be inferred or presumed as a consequence of severe injuries. SunBridge Healthcare Corp. v. Penny , 160 S.W.3d 230, 248 (Tex. App.-Texarkana 2005, no pet.). A plaintiff can establish the existence of conscious pain and suffering through circumstantial evidence and expert opinion testimony. Id. ; see also Las Palmas Med. Ctr. v. Rodriguez , 279 S.W.3d 413, 418 (Tex. App.-El Paso 2009, no pet.). The jury heard the testimony summarized above regarding Nico's injury and his treatment during the four days he survived. They also heard the medical experts and psychologists testify regarding the pain that burn victims experience not only during the actual injury, but also during the treatment of their burns. The jury also viewed the photographs entered into evidence visually documenting Nico's condition in the hospital. We conclude that the evidence is factually sufficient to support the jury's award of damages for Nico's pain.
As to mental anguish, the jury heard de los Santos testify that Nico was still conscious when de los Santos reached him on the platform. Based on this evidence, the jury could reasonably conclude that Nico was aware of what was happening to him while he was on fire. There is also evidence that Nico was still conscious and talking and experiencing pain when he arrived at the hospital. The doctors told Nico that they would have to amputate his arms and legs for him to have any chance to survive his injuries. The doctors never cut off his limbs, so the jury could reasonably infer that Nico was aware that he had no chance of surviving his injuries prior to his death. We conclude that the evidence is factually sufficient to support the jury's award of damages for Nico's mental anguish. See Union Pac. R. Co. v. Legg , No. 03-07-00512-CV, 2009 WL 2476636, at *3 (Tex. App.-Austin Aug. 12, 2009, no pet.) (mem. op.) ("We conclude there is legally sufficient evidence to support a jury finding that Dustin consciously experienced mental anguish in the moments prior to the train's colliding with his truck.").
H. The jury's awards of non-economic damages to Nico's parents are excessive.
Finally, Critical Path challenges the non-economic damages awarded to Mr. and Mrs. Cuevas as a result of Nico's death. The jury awarded each parent $2,500,000 for past and $2,500,000 for future loss of companionship and society. The jury also awarded each parent $2,500,000 for past and $2,500,000 for future mental anguish.[48] With respect to Mrs. Cuevas's award, Critical Path recognizes *575 there is evidence in the record that would support some award of non-economic damages, but it argues that a $10,000,000 total award is excessive and must be remitted. As to Mr. Cuevas, Critical Path argues there is no evidence in the record that he was present in the Memphis hospital nor that he participated in the decision to place Nico on comfort measures. As a result, Critical Path contends there is legally insufficient evidence to support any award of non-economic damages to him. Alternatively, it argues that the total award of $10,000,000 to him is excessive and must be remitted.
In wrongful death cases, mental anguish is the emotional pain, torment, and suffering that the plaintiff would, in reasonable probability, experience from the death of a family member. Moore v. Lillebo, 722 S.W.2d 683, 688 (Tex. 1986). Damages for mental anguish are intended to compensate the beneficiary for the deleterious effect that the wrongful death had on the beneficiary. See ids="9982053" index="152" url="https://cite.case.law/sw2d/722/683/#p687">id. ; Thomas v. Uzoka, 290 S.W.3d 437, 455-56 (Tex. App.-Houston [14th Dist.] 2009, pet. denied). To recover damages for mental anguish, a claimant must demonstrate a high degree of mental suffering beyond disappointment, anger, resentment, or embarrassment, although mental anguish may include all of these emotions. Thomas, 290 S.W.3d at 455. Proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings. Id. In a wrongful death case, proof of a familial relationship is some evidence that the surviving family members suffered mental anguish as a result of the death. Moore , 722 S.W.2d at 685. In such a case, therefore, it is not necessary for the plaintiff to prove that mental anguish is physically manifested. Id. A physical manifestation of mental anguish is, however, evidence of the extent or nature of the mental anguish suffered. Id. at 686.
Loss of companionship and society refers to the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have experienced had the decedent lived. See Moore , 722 S.W.2d at 687-88. As compared with mental anguish, which emphasizes the negative impact of the wrongful death on the beneficiary, loss of companionship and society focuses on the removal of positive benefits that the beneficiary once enjoyed but that were taken away by the wrongful death. See id. at 688. Although mental anguish is distinguishable from loss of companionship and society, in awarding damages for both elements, the jury may consider some of the same factors. The considerations for loss of companionship and society include (1) the relationship between the decedent and the beneficiary; (2) the living arrangements of the parties; (3) any extended absence of the decedent from the beneficiary; (4) the harmony of family relations; and (5) the family's common interests and activities. See id.
As with other damages for personal injury, evidence of the existence of compensable non-economic damages in a wrongful death case is not enough; there must also be some evidence to justify the amount awarded. See Saenz, 925 S.W.2d at 614. Although the factfinder has a measure of discretion in finding damages, that discretion is limited. Id. The jury simply cannot pick a number and put it in the blank; it must find an amount that "would fairly and reasonably compensate" for the loss. Id.
Mrs. Cuevas testified at trial. Mr. Cuevas was unable to testify because he was in the hospital for open heart surgery. Mrs. *576 Cuevas testified that Nico was their middle son. Several witnesses testified that prior to the explosion, there was a close familial relationship between Nico and his parents. Mrs. Cuevas explained that Richard called his parents to let them know there had been an accident in Memphis. Richard would not tell his parents any details about the accident, only that they needed to come to Memphis quickly and they would be there for a while. Mr. and Mrs. Cuevas left immediately. They would stay in Memphis for the entire eight months that Daniel was in the burn unit.
When they arrived at the hospital, Mr. and Mrs. Cuevas went to see their injured sons, who were in the same hospital room. Mrs. Cuevas testified that when she saw Nico and Daniel, one dying and the other seriously injured, it was "the saddest day of my life." Mrs. Cuevas continued that it "changed my life forever since that day." Soon after they arrived at the hospital, the doctors told Mr. and Mrs. Cuevas that Nico's "burns were very severe; and if he did survive, they would have to amputate his arms and legs." The doctors eventually told Mrs. Cuevas that it actually would be better for Nico to die "because the people that actually survive those kinds of burns would ask to die because it was so, so painful." The doctors then asked for permission to put Nico on comfort measures only. According to Mrs. Cuevas, she "accepted the ... prognosis that the doctors were giving me, and I resigned myself to that because I didn't want my son to have to go through that situation. There was no chance for him to survive. Everything was black from this point on, the back of his head. Everything. Everything was burned." Mrs. Cuevas gave the doctors permission to use only comfort measures on Nico. Four days after the explosion, Nico died with family and friends in the room, including his father.
Lugo was one of the friends in the room when Nico died. He testified that Mr. and Mrs. Cuevas took Nico's death hard. Before Nico died, Mrs. Cuevas had a priest brought in to give Nico his last rites; Mrs. Cuevas wanted Nico to "leave with God's blessing through this priest." Mrs. Cuevas testified that "faith is what allows me to be up every day. If it wasn't for that, I don't know where I'd be. I don't know what would have happened to me."
Nico's death also impacted Mr. Cuevas. According to Mrs. Cuevas, "[h]e felt terrible, but he was trying to be supportive of me. So, he put his emotions to one side." Daniel also confirmed that his brother's death greatly impacted their father. Daniel testified that he was not told immediately that his brother had died from his injuries, but he "knew something was wrong because I saw my dad crying when I asked him, you know, about my brother."
Arriving in the hospital to see one of his sons dying also affected Mr. Cuevas physically. According to Mrs. Cuevas, his blood pressure went up very high and resulted in heart problems, which ultimately led to his hospitalization for open heart surgery. She also testified that Mr. Cuevas is only 66 years old, but he now looks like an 80-year-old man. Lugo also confirmed that Mr. Cuevas has changed since Nico's death. According to Lugo, Mr. Cuevas used to be an outgoing man who enjoyed outdoor activities such as fishing and cookouts. Mr. Cuevas is now grouchy and no longer interested in fishing or his other former activities. According to another family friend, Pedro Samaniego, Mr. Cuevas was a very active man before the explosion. He described Mr. Cuevas as "a businessman, liked to buy and sell, move from here to there. And now he just doesn't say anything. He's very, very quiet. I-it is my belief that in that accident *577 I didn't only lose one friend. I lost all ... of them."
We conclude that the evidence summarized above constitutes legally sufficient evidence to support the jury's award of non-economic damages to Mr. and Mrs. Cuevas. See Service Corp. Int'l v. Guerra , 348 S.W.3d 221, 233 (Tex. 2011) ("We conclude that there is some evidence to support the jury's finding that Mrs. Guerra suffered the degree of mental pain and distress that will support damages for mental anguish."). Although there is some evidence to support the jury's award of mental anguish and loss of companionship and society damages to Mr. and Mrs. Cuevas, we nevertheless conclude that there is factually insufficient evidence to support the amount awarded and that the award is excessive. Here, the jury picked a final amount of $10,000,000 for each parent's damages, divided that total by the number of damage blanks in the jury charge, and then filled in the same amount of damages in each blank. This a jury cannot do. See Lane v. Martinez , 494 S.W.3d 339, 351 (Tex. App.-Eastland 2015, no pet.) ("[I]t appears that the jury in this case did not give careful consideration to each of the damage elements but, rather, picked a number at random and just filled in the blanks.").
When we conclude that part of a damages verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of the part of the award that is not supported by sufficient evidence. Tex. R. App. P. 46.3 (court of appeals may suggest remittitur). In considering the amount of an appropriate remittitur, in addition to the evidence in the record, courts of appeals have examined discovery responses, other appellate cases, and closing argument. See PNS Stores , 484 S.W.3d at 519 (affirming jury's damage award even though it was twice the amount requested by party); Bishop Abbey Homes, Ltd. v. Hale , No. 05-14-01137-CV, 2015 WL 9167799, at *19 (Tex. App.-Dallas Dec. 16, 2015, pet. denied) (mem. op.) (reducing damage award to amount requested in discovery responses); Hawkins v. Walker , 238 S.W.3d 517, 528-31 (Tex. App.-Beaumont 2007, no pet.) (examining appellate court handling of damage awards).
In this case, the record shows a close family relationship between Nico and his parents. The record also shows that both his mother and his father suffered severe grief reactions. Finally, there was evidence that Mr. Cuevas experienced serious medical issues as a result of his son's death. We conclude that the evidence supports an award of non-pecuniary damages to each of Nico's parents in excess of the $300,000 suggested by Critical Path based on its analysis of other cases involving large awards of non-pecuniary damages.
There are no discovery responses in the record. Also, appellees did not mention Mr. and Mrs. Cuevas's non-pecuniary damages during closing argument. But Critical Path did. Critical Path's trial counsel told the jury:
In terms of-for Mr. and Mrs. Cuevas for-my numbers-there's lots of different blanks here, but my numbers total about 7 and a half million dollars. It's pecuniary loss in the past-there's not a lot of evidence of a lot of pecuniary loss, but there's a lot of loss of companionship and society and mental anguish that they have suffered in the past and that they're going to suffer in the future. Because it's obvious that Mrs. Cuevas is very close to her son; and so, I'm not doubting that at all. That's you know-those are very difficult numbers and very difficult things.
We agree with Critical Path's counsel that there is "a lot of [evidence of] loss of *578 companionship and society and mental anguish" suffered by Mr. and Mrs. Cuevas and that the evidence supports a total award of $7,000,000.[49] Therefore, we suggest a remittitur to the following amounts:
Mr. Cuevas's loss of companionship in the past: $500,000
Mrs. Cuevas's loss of companionship in the past: $750,000
Mr. Cuevas's loss of companionship in the future: $500,000
Mrs. Cuevas's loss of companionship in the future: $1,250,000
Mr. Cuevas's mental anguish in the past: $1,250,000
Mrs. Cuevas's mental anguish in the past: $1,000,000
Mr. Cuevas's mental anguish in the future: $750,000
Mrs. Cuevas's mental anguish in the future: $1,000,000
See Wellborn v. Sears, Roebuck & Co. , 970 F.2d 1420, 1427 n.13 (5th Cir. 1992) (affirming large damage awards for mental anguish and loss of companionship to mother of minor child); Gutierrez v. Exxon Corp. , 764 F.2d 399, 403 (5th Cir. 1985) (affirming damage awards for loss of companionship and mental anguish totaling $1,000,000); Thomas, 290 S.W.3d at 455-56 (affirming $550,000 award of past and future loss of companionship damages); Russell v. Ramirez , 949 S.W.2d 480, 487 (Tex. App.-Houston [14th Dist.] 1997, no writ) (affirming $750,000 award for loss of companionship and mental anguish damages).
CONCLUSION
We overrule Critical Path's first three issues and affirm the trial court's judgment on the claims of Richard (individually and on behalf of Nico's estate), Torres and his wife Blanca Rodriguez, de los Santos, and the Smiths. Because the evidence is insufficient to support the total amount of future medical damages the jury awarded Daniel and the amount of non-pecuniary damages awarded Mr. and Mrs. Cuevas, we sustain Critical Path's fourth issue to the extent it challenges these damage awards as excessive.
In this situation, we may suggest a remittitur, and we do so here. See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp. , 299 S.W.3d 106, 124 (Tex. 2009). Turning first to Daniel's future medical damages, the evidence is sufficient to support a future medical damages award of $8,344,298. Taking into account the jury's proportionate responsibility findings, we suggest a remittitur of $279,342.00 for a total recovery of all damages $4,637,743.23. With respect to Mr. Cuevas's non-pecuniary damages, the evidence is sufficient to support a total damage award of $3,000,000. Taking into account the jury's proportionate responsibility findings, we suggest a remittitur of $420,000 for a total recovery of all damages $187,126.66. Finally, the evidence is sufficient to support a total damage award of $4,000,000 for Mrs. Cuevas's non-pecuniary damages. Taking into account the jury's proportionate responsibility findings, we suggest a remittitur of $360,000 for a total recovery of all damages $247,126.66.
The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded for a new trial. Larson v. Cactus Util. Co. , 730 S.W.2d 640, 641 (Tex. 1987). If appellees file a remittitur within twenty days from the date of this opinion, we will modify the trial court's judgment accordingly and affirm the judgment as modified. If the remittitur *579 is not timely filed, we will reverse the trial court's judgment in part and remand this case for a new trial on the claims of Daniel and Mr. and Mrs. Cuevas. Tex. R. App. P. 46.3 ; see Tex. R. App. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested.").
( Jewell, J., dissenting).
DISSENTING OPINION

Witnesses used the terms master scheduler and lead scheduler interchangeably.

Primavera is a project planning tool used to plan and schedule a job. When importing a job into Primavera, the program asks for the duration of the job and whether there are any pre-job or post-job tasks that need to be completed related to the job.

During trial, the parties frequently used a simple example to express the concept of job logic: before Task C could be scheduled, Rivers had to ensure that predecessor Tasks A and B had been scheduled.

The south flare contained three pilot lights that were used to ignite and burn up any gas by-products produced during the refining process. The Memphis refinery had two flare lines, each capable of handling the gas by-products produced by half the refinery.

Valero conducted an investigation of the explosion soon after it happened. The version of the master schedule dealing with the south flare line work that Valero investigators located was dated February 6, 2012. This schedule included the time and labor required to obtain the work permit for the installation of the blind into the south flare line. It also included the time and labor required to install the blind, but it did not include the time and labor required to isolate and clean the south flare line. Rivers admitted during trial that his scheduling on the south flare line was not completed as of January 2012.

During its investigation, Valero searched for plans for isolating and cleaning the south flare line. The investigators found only one plan: the one Ronnie Rainer emailed on March 4, which we discuss below. John Brewer, the engineer who led Valero's investigation of the explosion, testified that the investigators found no evidence that a plan was in place for isolating and cleaning the south flare line before March 4. Brewer had no knowledge as to why a plan was not in place before that point in time.

The south flare line was a 36-inch diameter pipeline. A knockout drum is a large cylindrical vessel or chamber placed in a refinery pipeline upstream of a flare. Because a flare can only handle gases, a knockout drum is placed in the line to separate solids and liquids from gases and remove them from the line. The south flare line knockout drum is thirteen feet in diameter and approximately sixty feet in length.

Wyatt and JVIC were two of the contractors performing work on the south flare line.

The valve was closed before the work started.

Richard explained that boilermakers do repair and construction work on refinery equipment such as towers, vessels, and lines.

Bunker gear is heavy, fireproof clothing similar to what firefighters wear. Bunker gear is required if workers are going to work on a live flare line. A live line means a line that has not been cleaned or has a flame source.

Smith was working on the ground in support of the workers on the platform when he saw a big flame shoot up from the platform. Smith was blown over by the explosion. Smith does not remember what happened to him, but when he came to, he was standing up, his hardhat was gone, and he had intense pain in his head. He found his hardhat several feet away and put it back on. He then looked up at the platform and saw the men there were on fire. Smith walked to a truck struggling to remain conscious. When he reached the truck he turned back toward the platform where he saw Torres "just walking around, bumping into things, and screaming." He saw Nico laying on his back on the platform tangled in the gasket. Nico was no longer burning, and Smith saw Nico bring "his knee up; and there was no meat, just bones."

Valero terminated Rainer and Crutcher at an unknown time after the explosion.

The investigators did not talk to Richard Cuevas about the explosion. They also did not interview Mike Rivers.

The jury also found that two other entities were negligent. The findings regarding those entities are not relevant to the issues raised in this appeal.

Lear Siegler , 819 S.W.2d at 472 ; see also IHS Cedars , 143 S.W.3d at 800 (considering whether "the causal link between conduct and injury [is] too remote to be legally significant" and constitute a cause-in-fact).

Union Pump Co. v. Albritton , 898 S.W.2d 773, 775-76 (Tex. 1995), abrogated on other grounds by Ford Motor Co. v. Ledesma , 242 S.W.3d 32 (Tex. 2007) ; see also Union Pump , 898 S.W.2d at 781-82 (Cornyn, J., concurring); City of Gladewater v. Pike , 727 S.W.2d 514, 518 (Tex. 1987).

E.g., IHS Cedars , 143 S.W.3d at 800 ; Union Pump , 898 S.W.2d at 775-76 ; Bell v. Campbell , 434 S.W.2d 117, 122-23 (Tex. 1968).

Union Pump , 898 S.W.2d at 776 ; Bell , 434 S.W.2d at 122 ; Homeland Express, L.L.C. v. Seale , 420 S.W.3d 145, 150-51 (Tex. App.-El Paso 2012, no pet.) ; Thompson v. Curtis , 127 S.W.3d 446, 452-53 (Tex. App.-Dallas 2004, no pet.).

IHS Cedars , 143 S.W.3d at 801 ; Lear Siegler , 819 S.W.2d at 472 ; Bell , 434 S.W.2d at 122 ; Homeland Express , 420 S.W.3d at 150 (holding defendant's negligence "did not simply cause [plaintiff] to be in the wrong place at the wrong time").

Our dissenting colleague contends that we are limited to considering the evidence of breach recited by appellees in their brief. To the contrary, because Critical Path is challenging the sufficiency of the evidence to support a jury finding, we must "[c]redit[ ] all favorable evidence that reasonable jurors could believe and disregard[ ] all contrary evidence except that which they could not ignore." City of Keller , 168 S.W.3d at 830 (emphasis added). Our colleague's citation to Ward v. Lamar University , 484 S.W.3d 440, 453 (Tex. App.-Houston [14th Dist.] 2016, no pet.), is misplaced because in this context Critical Path-not appellees-is responsible for framing issues and advancing arguments entitling it to relief from this Court. See Tex. R. App. P. 38.1(f).

Rivers testified during trial that it was his practice to change the font on jobs listed on the master schedule to "all caps" when the planning and scheduling for that job was completed. Defendant's Exhibit 226 is an email chain with schedules attached. Rivers admitted those schedules, dated January 2012, were from the master schedule. The listing for the south flare line work is not in "all caps."

This testimony indicates that Critical Path should have familiarized itself with safety procedures and identified the valve plan as inconsistent with those procedures. Cf. post , at 585-87.

He also testified that the accident would have happened even if the stack had not been emitting flame.

See City of Keller , 168 S.W.3d at 819 ("Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so."); Design Tech Homes, Ltd. v. Maywald , No. 09-11-00589-CV, 2013 WL 2732068, at *6 (Tex. App.-Beaumont June 13, 2013, pet. denied) (mem. op.) ("When confronted with conflicting evidence, a factfinder may sometimes rationally choose to believe one witness and disbelieve another, may resolve inconsistencies in the testimony of any witness, or may reject expert testimony."); Warner v. Hurt , 834 S.W.2d 404, 408 (Tex. App.-Houston [14th Dist.] 1992, no writ) (rejecting contention that evidence of negligence and proximate cause was undisputed and concluding that, "[i]n view of the conflicting expert witness testimony, a fact issue was created for the jury to resolve").

Given this evidence, we find the dissent's resort to the equal inference rule both puzzling and misplaced. Valero's concerns with minimizing work time (and therefore cost) were not distinct from Critical Path's scheduling duties; those concerns were the very reason Valero hired Critical Path to perform such duties in advance. As we explain, Critical Path's breach of its duties created a situation in which those concerns were acute.

The dissent is certainly correct that Valero could have chosen to take more time to plan and execute the isolation and decontamination of the line before beginning work, and we conclude that Valero's negligence in failing to do so was a concurring cause of the explosion as explained in Part II.C. below. But the question before us is not simply, as the dissent would have it, whether Critical Path's negligence caused Valero's plan to be rushed. See post , at ---- - ----. Rather, in light of the evidence that Critical Path's negligent failure to schedule decontamination created a dangerous situation, the question is whether that situation had abated when Valero's negligent conduct (of whatever duration) and the explosion occurred. See n. 19, infra.

This does not include the time necessary to plan and schedule the isolation and cleaning, which Critical Path's Cormier testified is supposed to take place many months in advance of the work. If Critical Path had fulfilled that obligation timely, a safe plan could have been developed and carried out by appropriately trained personnel, as shown by the evidence regarding the planning and work done after the explosion to decontaminate the flare line.

The jury also heard evidence that Rainer (1) had never been involved in work on a flare line before; (2) had been assigned to provide operations support for the south flare line work, not to plan the work; (3) had no prior experience with the specific type of work planned on the south flare line; (4) received no training on how to make sure the work got completed correctly and safely; and (5) did not review Valero's policies related to the type of work planned on the south flare line before he unilaterally developed his own plan for isolating and decontaminating the line. The dissent notes (post , at 589) that no witness testified Rainer's supervisory assignment would have been different had Critical Path timely scheduled the decontamination. But there is evidence that planning was a task Rainer took upon himself, not part of his assigned duties. Rather, the evidence summarized in Part A of the background section shows that planning and scheduling were to be done in the office by the team of the turnaround manager, lead planner, and master scheduler.

The evidence discussed in this paragraph and the preceding paragraph indicates that the plan and the tasks were rushed. Cf. post , at 587-88.

See also Henry v Houston Lighting & Power Co. , 934 S.W.2d 748, 753 (Tex. App.-Houston [1st Dist.] 1996, writ denied) ; Gannett Outdoor Co. , 710 S.W.2d at 85 ; Teer v. J. Weingarten, Inc. , 426 S.W.2d 610, 614 (Tex. App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.).

Critical Path also requested that the trial court include a definition of new and independent cause: " 'New and independent cause' means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence."

The sentence reads: "Moreover, applying the caselaw set out in the section below, the evidence established that these events destroyed any causal connection between the actions of Critical Path and Mike Rivers and the accident, as a matter of law." Critical Path then quotes from the Arguelles case, in which we held that the defendants were entitled to summary judgment because they had proved a new and independent cause as a matter of law. 222 S.W.3d at 730. In this case, Critical Path does not argue that the trial court erred in denying any motion for summary judgment.

The dissent appears to contend that Critical Path preserved a superseding cause-based challenge to the legal sufficiency of the evidence of proximate cause simply by raising that challenge in a JNOV motion, regardless of whether Critical Path received an instruction on superseding cause in the charge. Post , at 583. Given the general rule of Osterberg , we disagree. As explained above, the concept of superseding cause is not baked into the standard instruction on proximate cause given to this jury; an additional instruction is necessary to submit superseding cause when it is raised by the evidence. See Dew , 208 S.W.3d at 451 ; Dallas Ry. & Terminal Co. , 250 S.W.2d at 384. In order to obtain review of the legal sufficiency of the evidence as if an instruction on superseding cause had been given, Critical Path would first have to show that such an instruction was improperly refused. Berkel & Co. Contractors , 543 S.W.3d at 297-98, 2018 WL 1403545, at *6.

See Walker v. Harris , 924 S.W.2d 375, 377 (Tex. 1996) ; Nixon v. Mr. Prop. Mgmt. Co. , 690 S.W.2d 546, 551 (Tex. 1985) ; D'Andrea v. Epstein, Becker, Green, Wickliff & Hall, P.C. , 418 S.W.3d 791, 799 & n.10 (Tex. App.-Houston [14th Dist.] 2013, pet. denied) ; Restatement § 442B, cmt. b ("If the actor's conduct has created or increased the risk that a particular harm to the plaintiff will occur, and has been a substantial factor in causing that harm, it is immaterial to the actor's liability that the harm is brought about in a manner which no one in his position could possibly have been expected to foresee or anticipate," including through intervening forces "of third persons which are not intentionally tortious or criminal. This is to say that any harm which is in itself foreseeable, as to which the actor has created or increased the recognizable risk, is always 'proximate,' no matter how it is brought about," with exceptions not applicable here.).

Our dissenting colleague argues that this factor is present because it was unforeseeable that Valero would violate its own policies. As explained above, Critical Path's failure to foresee the manner in which the harm occurred does not prevent it from being liable. In any event, this factor is based on hindsight, not foreseeability. Compare Restatement § 435(1) with § 435(2).

Contrary to the dissent's portrayal of the record, the knowledge that the line had not been isolated or decontaminated was hardly universal among personnel of Valero or its contractors. As Critical Path's expert characterized the situation, there was a good deal of miscommunication and "not a lot of inspecting what they expected. They just assumed that things had been done." For example, Rainer testified that he told Larry Loomis (a Valero safety employee) there was no flow through the line, and Loomis testified that he concluded bunker gear was not needed because he was unaware of the valve leak or that the pilot lights were still lit. Byrnes, the JVIC planner and general foreman for the turnaround, testified that he did not know the valve was leaking and believed the flare was dead. Matte and Duvall, JVIC safety employees, testified that Rainer told attendees at the safety meeting that the line had been steamed and the pilot lights were off.

Our dissenting colleague contends that this statement reverses the burden of proof. We disagree. In order to obtain an instruction on new and independent cause (or show that such an instruction was improperly refused and therefore should be considered in conducting a sufficiency analysis), Critical Path had the burden to offer evidence raising the issue.

The dissent also points to Aerospatiale Helicopter Corp. v. Universal Health Services, Inc. , 778 S.W.2d 492, 496-97 (Tex. App.-Dallas 1989, writ denied), in which the court held the defendant manufacturer's negligence that damaged one of two independently sufficient helicopter engines was not a proximate cause but merely furnished the condition that made a crash possible when the pilot ignored the manufacturer's manual and deliberately bypassed a safety feature to recklessly turn off the other engine. That case is inapposite here. Critical Path's negligence did not merely furnish a condition as explained above; it created a flaw in the schedule (akin to Aerospatiale 's manual) that Critical Path prepared for use by third parties, and both Critical Path's and the third parties' negligence increased the same risk along the entire line.

This was the reason the trial court gave for refusing Critical Path's requested instruction regarding new and independent cause.

Based on the jury's finding that Critical Path was responsible for six percent of the harm, the past medical expenses included in the judgment totaled $378,000 while future medical expenses were $780,000.

Although Critical Path references Dr. Lichtblau when discussing the cost of Daniel's future medical care, the testimony regarding the present value of Daniel's future medical care was actually provided by an economist, Dr. Thomas Mayor. Dr. Mayor based his calculations of the present value of Daniel's future medical care expenses on the lifecare plan prepared by Dr. Lichtblau. Dr. Mayor performed similar calculations with respect to Guadalupe Torres.

Dr. Lichtblau stated: "I have not included all the costs for the potential complications. These patients are going to have future care, and with these ... there are potential complications." Dr. Lichtblau continued: "but because I can't predict the frequency, the duration, or the intensity of the complications, I can't come up with an accurate number. So I do not include that number. I do not include 1 million to 4 million dollars['] worth of care."

This amount includes the amount reasonably necessary to modify Daniel's home as well as the cost of replacing Daniel's electric wheelchair every three years over his remaining predicted lifespan.

The evidence regarding loss of future earning capacity was presented by two expert witnesses on each side: a vocational expert and an economist who took the vocational expert's opinions regarding the type of work each injured worker would be able to do and converted it into a present-value earnings figure. According to Dr. Mayor, the present value of Richard's loss of future earning capacity was $1,066,607. Critical Path's economist expert, Dr. Ron Luke, testified that the present value of Richard's loss of earning capacity was $1,009,273.

These amounts were reduced in the judgment to $228 and $3,686.64, respectively.

Based on the jury's finding that Critical Path was responsible for six percent of the harm, the pain award was reduced to $240,000 and the mental anguish award to $360,000.

Based on the jury's finding that Critical Path was responsible for six percent of the harm, each category of non-pecuniary damages awarded to Mr. and Mrs. Cuevas was reduced to $150,000.

As discussed above, the jury also awarded pecuniary damages to Mr. and Mrs. Cuevas that were included within the figure suggested by Critical Path's counsel.